Henry INGRAM, James Britt, William Moody, and Roy T. Floyd, Individually and on behalf of all persons similarly situated, Plaintiffs,

and

Frances Williams, Edward Milon, Horace Mitchell, Herbert Bruton, Jovino Garcia, Intervenors,

v.

MADISON SQUARE GARDEN CENTER, INC., Madison Square Garden Corporation, Allied Maintenance Corporation, Allied Public Events Service Corporation, and Local # 3 I.B.E.W., Defendants.

Shelly L. ANDERSON, James L. Perry, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

MADISON SQUARE GARDEN CENTER, INC., Madison Square Garden Corporation, Allied Maintenance Corporation, Allied Public Events Service Corporation, Local 3 I.B.E.W., Local 54, Service Employees International Union, Defendants.

Nos. 76 CIV 5870 (LBS), 78 CIV 1453 (LBS).

United States District Court, S. D. New York.

Oct. 3, 1979.

See also, D.C., 482 F.Supp. 426.

Lewis Tesser, New York City, for plaintiffs.

Menagh, Trainor & Rothfeld, Norman Rothfeld, New York City, for defendant Local Union No. 3, I.B.E.W.

## OPINION

SAND, District Judge.

In each of two separate cases now consolidated for trial, suit was brought by two classes which together comprise all black and hispanic persons who have been or will in the future be employed as "cleaners" [1] by

---

1. The term "cleaners" is used in this opinion to describe those employed at the Garden as either "five day" cleaners, "six day" cleaners, bowling alley cleaners, bathroom attendants or elevator operators. Where relevant, the respective duties of those employed at the Garden are described below. Each of the four classes involved in this action also includes those persons fitting the class description who

the defendants Madison Square Garden Center, Inc. ("Center, Inc."), Madison Square Garden Corporation ("Garden Corp."), Allied Maintenance Corporation ("AMC"), and Allied Public Event Service Corporation ("Allied"). Local # 3, International Brotherhood of Electrical Workers ("Local 3"), is also named as a defendant in these actions.[2] Plaintiffs allege that defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1970) and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1985 (1970) respectively,[3] by engaging in a pattern of hiring and employment practices which made it impossible for class members to secure the higher paying and generally more desirable position as "laborer" at Madison Square Garden ("the Garden"). Prior to trial, Center, Inc., Garden Corp., AMC and Allied all entered into a proposed consent decree,[4] and the consolidated trial of

---

receive pensions based on their past employment as cleaners at the Garden.

2. The cleaners union, Local 54, Service Employees International Union, was also named as a defendant in this action. However, since plaintiffs have not pressed their claims against Local 54 and since counsel for that defendant did not participate in these proceedings, the claims against that party are considered as having been dropped by plaintiffs.

3. It has generally been held, in this and other Circuits, that the filing of a timely charge with the EEOC against an employer or union is a jurisdictional prerequisite to the bringing of a Title VII suit against the same defendant. *Schick v. Bronstein,* 447 F.Supp. 333 (S.D.N.Y. 1978); *Bertheas v. TWA* 450 F.Supp. 1069 (E.D.N.Y.1978); *Gabriele v. Chrysler Corp.,* 573 F.2d 949, 954 (6th Cir. 1978); *Miller v. International Paper,* 408 F.2d 283 (5th Cir. 1969). As is clear from the discussion below, Local 3 was not named as a party in the EEOC proceeding which preceded the first (the *"Ingram"* action) of the two law suits involved here. Although there are exceptions to the general rule just described, *see, e. g., Schick v. Bronstein, supra; Stith v. Manor Baking Co.,* 418 F.Supp. 150, 156 (W.D.Mo.1976), and although it is not entirely clear that the Ingram plaintiffs' Title VII claim against Local 3 would not fit under one of these exceptions, plaintiffs' counsel conceded that that claim is barred by the failure to name Local 3 in the EEOC charge. Thus, insofar as the Ingram plaintiffs are concerned, plaintiff relies solely on its § 1981 and § 1985 claims.

4. Under the terms of the proposed decree—which is pending before this Court for approval—Center, Inc., Garden Corp., AMC and Allied ("the defendants"), while maintaining that "they are and always have been in full and complete compliance" with Title VII and all other federal and state employment discrimination statutes, agree to work towards the goal of employing blacks and hispanics ("minorities") at the Garden as laborers in accordance with their general proportion in the labor force in the New York local labor market. To this end, the plaintiffs and Garden defendants agree to the following:

(1) Five of the members of the plaintiff class, (Ingram, Britt, Pettigrew, Boudreaux and Perry) will be given the opportunity to become laborers before any other person is hired as a laborer by Center, Inc., which retains its good faith right to reject or terminate employment of these plaintiffs.

(2) Center, Inc. will thenceforth use its best efforts to fill every second available job in the laborer's force with a qualified minority applicant—with qualified class members having the opportunity to fill every fourth (*i. e.,* every second minority, position, until minority representation among the laborers reaches 27%.

(3) The decree is not applicable either to the hiring of laborers on a "temporary" basis as defined in the decree, or to the reemploying of laborers who are at present or in the future may be laid off. Center, Inc. is not obligated to increase the number of permanent laborers.

(4) Nothing in the agreement effects the seniority or other rights of existing laborers, except that the defendants agree to be bound by any order or settlement regarding seniority subsequently entered against Local 3.

(5) After the 27% goal is reached, and for not less that 5 years from the effective date of the decree, or one year after the 27% goal is reached, whichever occurs later, Center Inc. is required to post notices of laborer openings at a prominent place within the Garden; setting out application procedures and necessary qualifications. There is no obligation to maintain minority representation within the laborer force at or above the 27% level at all future times.

(6) Defendants agree to pay $117,500 to the named plaintiffs and all class members in full settlement of plaintiffs' monetary claims.

(7) Defendants will not oppose an application by plaintiffs' attorney for legal fees and expenses in the sum of $47,500, and counsel for plaintiffs will make no application against the settling defendants for legal fees in excess of that amount. Plaintiffs also agree to indemnify settling defendants from any claims or judgments against them resulting from any order or settlement with Locals 3 or 54.

these two actions was limited to the issue of Local 3's liability under the employment discrimination statutes involved. The question of damages was left for separate consideration should liability be found.

The plaintiffs in each suit were arranged in a Title VII class and a §§ 1981 and 1985 class. In the first suit, the "Ingram" action, the Title VII class is limited to black persons employed as "cleaners" since February 14, 1973, and the §§ 1981 and 1985 class to those black and hispanic persons so employed since December 30, 1973. In the second suit, the "Anderson" action, the two classes are identically described except for the limitation dates, which in the Anderson action are May 28, 1975 and March 31, 1975, respectively. On August 13, 1973, the Ingram plaintiffs filed charges against "Madison Square Garden" and AMC with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e–5. Notices of "Conciliation Failure" and "Right to Sue" were issued on October 4, 1976 and on December 30, 1976, within the 90 day jurisdictional period provided by 42 U.S.C. § 2000e–5(f)(1), the Ingram plaintiffs filed their initial complaint in this action against Center, Inc. and AMC. The complaint was subsequently amended to include Allied, Garden Corp. and Local 3. Local 3, which was served with a summons and complaint on June 22, 1977, was not a party to the Ingram EEOC action. On November 24, 1975, the Anderson plaintiffs filed charges with the EEOC against "Madison Square Garden", AMC and Local 3, and a notice of right to sue was issued on January 16, 1978. The Anderson complaint was filed on March 31, 1978 and served on Local 3 (which was a party to the Anderson EEOC action) on August 21, 1978.[5]

The crux of plaintiffs' complaint with respect to Local 3 is that the union, which is the bargaining agent for the "laborers" at the Garden and which refers prospective employees to the Garden for employment as laborers, employs a completely subjective and standardless referral policy, relying almost entirely on word of mouth and favoritism, and that that policy operates to discriminate against class members by preventing them from becoming laborers.[6] The defendant, in addition to denying that the manner in which it refers laborers to the Garden violates any of the employment discrimination statutes involved, also interposes several jurisdictional issues and the statute of limitations as a defense. The Court concludes that the defendants' threshold objections with respect to Title VII and § 1981 are without merit,[7] and finds that Local 3's referral "policy" violates both provisions. The plaintiffs' § 1985 claims, however, are dismissed in accord with the Supreme Court's recent ruling in *Great American Federal Savings & Loan Assoc. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957, 20 EPD 30,004 (1979). The following discussion constitutes our findings of fact and conclusions of law pursuant to F.R.C.P. 52.

## I. The Employment Structure at the Garden

Center, Inc. currently employs a staff under the direction of a superintendent at the Garden. The staff includes electricians, oilers and firemen, engineers, carpenters, painters and laborers. Prior to July 2, 1969, Center, Inc. also employed personnel in the

---

(8) Notice of this proposed decree was mailed or personally delivered to members of the plaintiff class on September 28, 1979. Given the terms of the proposed consent decree and this Court's finding as to Local 3's liability, the primary question in the remedial stage of this proceeding will be the seniority rights of class members who become laborers.

5. A complaint in intervention was filed by intervenors Williams, Milon, Mitchell and Garcia on June 30, 1978, and a Sixth Amended Complaint, containing the combined charges of the

plaintiffs and intervenors was served on July 16, 1979.

6. Plaintiffs have made a number of other allegations concerning an alleged conspiracy between defendants and Local 3's status as an employment agency under 42 U.S.C. § 2000e(c). Given our decision in this case, a resolution of those issues is unnecessary here.

7. Except with respect to the Ingram Title VII claim, which is discussed in footnote 3 above.

job category referred to herein as "cleaners". On that date, Center, Inc. completed a process it had begun two years earlier [8] by entering into a contract with Allied under which Allied agreed to provide all janitorial and lavatory services at the Garden. Center, Inc. employees in the cleaner category were offered the opportunity to work for Allied at the Garden in the same capacity in lieu of discharge, and most accepted.[9] Allied currently provides all janitorial and lavatory services at the Garden, and the work of the cleaners is substantially the same today as it was in the pre-Allied period.

Laborers effect the changeovers from one event to the next, a task which requires them to erect and remove various structures, operate vehicles such as forklifts, ice scrapers and vans, effect repairs in the roof, floors, sidewalks and athletic or other equipment, and move around various heavy objects. The laborers also spend a portion of their time cleaning, but the parties disagree as to how much time is so spent.[10] Although the Court agrees with defendant's contention that the question is irrelevant to the issue of whether Local 3 has violated the employment discrimination statutes, the Court finds that the job of laborer is, on the whole, more strenuous than that of cleaner, but that laborers spend between one-third and one-half of their day performing tasks similar or identical to those performed by cleaners. The Garden imposes no independent qualifications for the job of laborer other than passing the physical examination required of all employees,[11] and it generally hires laborers through the union referral process described below.

Cleaners perform general cleaning and janitorial functions at the Garden such as mopping, washing, dusting, trash removal, etc., and those cleaners classified as lavatory attendants perform similar functions in the lavatory areas only. The hiring of cleaners is done solely by Allied, which recruits its employees from various sources and which imposes no specific physical or education requirement for the position of cleaner at the Garden.[12] Cleaners generally earn between 65% and 70% of what laborers earn, and the differential in other employment benefits, e. g., pension and annuity plans, appears to be substantial. All employees at the Garden in the cleaner category are represented by Local 54.

The laborer force at the Garden has historically been all white. Prior to January 1, 1965, the effective date of Title VII, and since at least 1948, there had been no black or hispanic person employed as a laborer. Between 1965 and 1969, one of the twenty-two new laborers hired was black and one was hispanic, the rest were white. By July, 1977, around the time this law suit was initially filed, thirty-eight new laborers were hired, thirty-three of whom were white, four black and one hispanic. The 1978 Garden laborer work force consisted of fifty-five employees, forty-seven of whom were white, five black and three hispanic. The composition of the laborer work force has thus changed only slightly since blacks or hispanics were first hired in 1969.

By contrast, the cleaners work force, with the exception of those classified as six day

---

8. Beginning in August, 1967, Center, Inc. entered into a series of contracts with AMC or its subsidiaries, of which Allied is one, by which the latter agreed to take over and supply the labor force for various cleaning and janitorial functions at the Garden. This process culminated in the July 2 contract, which covered all interior area services not already served by AMC or its subsidiaries.

9. Elevator operators remain employees of Center, Inc. although they are members of Local 54 and are included in the classes involved here.

10. Plaintiffs claim that cleaning functions occupy "69%" of a laborer's day. Defendant con-

cedes only that such functions account for 2½ hours per day.

11. At trial, the Garden superintendent, Richard Donopria, testified that he "visually appraises" the physical ability of the men sent to him by the union, and that he occasionally has sent some people back because they were overweight. Each of those sent back was eventually hired, however.

12. A physical examination, two letters of reference and a willingness to work on weekends are required of those Allied employees sent to work at the Garden.

cleaners, has historically been almost exclusively black. The lavatory attendants were all black in 1978, and have been all black since at least 1948. The five day cleaners were all black between 1948 and 1969, and in 1978, of the thirty-four employees in that category, twenty-four were black, seven were hispanic and three were white. In 1978, the six day cleaner force, which was at one time composed largely of white women, totaled twenty-eight workers, of whom twelve were white, one black and fifteen hispanic. No cleaner in either category has ever transferred to a laborer position.

## II. Laborer Hiring at the Garden and Local 3 Referrals

The testimony of both Garden and Local 3 officials at trial revealed that since at least 1941, the hiring of laborers at the Garden has proceeded in the following manner:[13] when a vacancy in the laborer force occurs, the Garden superintendent, currently and for the past thirty-seven years Mr. Richard Donopria, either advises the Local 3 shop steward, currently a Mr. Mel Mullins, or advises the union directly, in the person of Mr. James O'Hara. O'Hara is one of three assistant business managers of Local 3 and, since 1969, has been the union's representative for the laborers. O'Hara alone makes referrals to the Garden for the position of laborer, and when Donopria is in contact with Mullins, Mullins informs O'Hara. In either case, once the union is advised that a vacancy exists, it sends a person with a "slip" indicating that he had been sent by the union to see Donopria. Donopria testified that he always checks to see whether an applicant had been sent by the union, and that he had hired laborers without a union slip only on special occasions for temporary spots. Thus, all of the

Garden's permanent laborer hiring results from Local 3 referrals,[14] although Center, Inc. may reject, for any reason, a person referred by Local 3 for a laborer's position. Center, Inc. does not advertise laborer vacancies in newspapers nor does it advise its employees or Allied employees at the Garden that such vacancies exist.

The practice followed by Local 3 in determining who to refer to the Garden in response to a request by Mr. Donopria for a new laborer can best be characterized as subjective and standardless. The union has no procedure by which one may register for referrals to the Garden as a laborer, and no list or record of workers seeking such a referral is kept. There is no regular procedure by which unemployed members of other Local 3 divisions can obtain referral for laborer work, despite the fact that other Local 3 divisions do have a referral procedure for unemployed members. Local 3 gives no test to, and requires no apprenticeship of, the people it refers to the Garden for employment as a laborer, and even union membership is not a prerequisite. Indeed, most of the people referred to the Garden during Mr. O'Hara's tenure were not union members. The only requirement for referral appears to be that the applicant be a friend, relative or the relative of a friend of Mr. O'Hara. O'Hara explicitly testified that most of the referrals were made on the basis of personal acquaintance, favorable impressions at interview and as the performance of favors for other persons.

The result of Local 3's referral "policy" was the near perpetuation of the completely segregated Garden laborer work force that existed until 1969. Although neither Local 3 nor Mr. O'Hara keep records of the Garden's requests for referrals or of the referrals actually made, O'Hara himself remem-

---

**13.** This account is drawn primarily from the testimony of Garden Superintendent Richard Donopria and Local 3 Assistant Business Manager James O'Hara.

**14.** Donopria did testify that one person hired as a temporary watchman, whose aunt was a supervisor of the cleaners, eventually became a laborer. At his deposition, O'Hara claimed that this incident, involving a laborer by the name of Thomas Blewitt, was one of a "couple" in which someone at the Garden recommended a man to him. He further testified that Blewitt was the only laborer now working at the Garden that he knew of who was so recommended. O'Hara Dep. 13.

bers the circumstances surrounding the referral of thirty-seven men to the Garden for the position of laborer. Of these, thirty-one were white, four black and two hispanic. Except for four who were recommended by others "associated" with Local 3, all of the white referrals were recommended by, or were themselves, friends of O'Hara, and only four were already members of Local 3. Of those four, one was O'Hara's son, and two were his friends. By contrast, all of the six minority members whom O'Hara remembers recommending were already members of other Local 3 divisions.[15] Of a total of thirty-seven new hires during O'Hara's tenure, thirty-one have been white, four black and two hispanic. At least one of the minority referrals took place after this litigation commenced, at which time O'Hara, by his own testimony, had already made known to Garden officials his desire to increase minority representation on the laborer work force.[16]

### III. Attempts By Class Members to Secure a Laborer's Position

Given the identical employment qualifications and the similarity of working conditions, it is hardly surprising that at least some of those employed as cleaners would attempt to secure a higher paying laborer's job. This is precisely what six class members claimed at trial to have done, and although much of this testimony was disputed, the Court finds that members of the plaintiff classes did, in fact, seek a laborer's position. Moreover, the Court also finds, as the plaintiffs contend, that those efforts were deliberately frustrated by union personnel who, on a number of occasions, either ignored, gave evasive answers to or just generally gave the run-around to class members who sought information from them as to how to become a laborer.[17] Although the number of these incidents was not great, the Court finds convincing plaintiffs' argument that given the context of two largely segregated work forces on the same site, defendant union's actions, in combination with those of the other defendants, were sufficient to "get the message across" and created an atmosphere which discouraged class members from actively seeking a laborer's position.[18]

Finally, the Court is not impressed with Local 3's argument, supported by O'Hara's testimony at trial, that the union did not recruit laborers from among class members because they were members of Local 54, a rival union with whom Local 3 had continuing jurisdictional disputes. As O'Hara himself testified at trial, those laborers who at the time of their employment were not members of Local 3, were required to join the union within thirty days. The result of referring a Local 54 member would thus be no different, insofar as Local 3 membership is concerned, than the referral of any other person not a member of any union. Local 54 was in no position to gain by such a referral, and Local 3 had nothing to lose. Defendant's argument would be more convincing if Local 3's policy had been to refer only Local 3 members for the laborer's position at the Garden, but it is clear that this was not the case.

15. Both plaintiffs and defendant agree that the minority members referred by O'Hara were specifically recruited on the basis of their race from other divisions of Local 3.

16. O'Hara testified at trial that when the case started (but before Local 3 had been made a party), he had discussed the hiring of blacks with a Vice President of Operations at the Garden. The Garden official responded that any such hirings should wait until the case had been decided.

17. Plaintiffs' witnesses also testified to similar activities on the part of Garden personnel.

This testimony is not relied on here, since we are concerned solely with the liability of Local 3.

18. Lawrence Hawkins, one of those class members who, on more than one occasion, sought information from union and Garden officials as to how to become a laborer, testified that he was "testing the waters", and after his inquiries were repeatedly ignored concluded that there was "no point". Hawkins also testified that he was told by Smith, a black laborer, that he would not want to become a laborer because he would receive a "hard time".

*IV. Jurisdiction*

 Defendant's remaining jurisdictional objections relate to plaintiff's [19] claims under §§ 1981 and 1985. With respect to § 1985, defendant urges that the recent Supreme Court decision in *Great American Federal Savings & Loan Assoc. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957, 20 EPD 30,004 (1979), which held that § 1985 may not be invoked to redress violations of Title VII, precludes plaintiffs' claims under § 1985. Plaintiffs' answer that the § 1985 claims they assert "transcend" Title VII, and that they should thus be exempted from the *Novotny* ruling.

The *Novotny* decision was based on the Court's conclusion that the detailed statutory procedure designed by Congress to govern Title VII claims, a procedure which emphasizes nonadversarial conciliation efforts and which incorporates federal and state administrative components, would be circumvented if § 1985 suits could be brought for the same type of claims.[20] The case of the Ingram Plaintiffs, who it will be recalled did not name Local 3 in their EEOC charge, is precisely the situation addressed by the Court in *Novotny*. Even where an EEOC charge is filed, however, *Novotny* precludes § 1985 relief for what amounts to a Title VII violation: the *Novotny* plaintiff's § 1985 claims were dismissed despite the fact that he had complied with all the jurisdictional prerequisites for a Title VII suit.

Plaintiffs here have given no indication of how their claims "transcend" Title VII and this Court, on the record before it, cannot see the basis for their claim.[21] The § 1985 claims of all plaintiffs herein are dismissed.

 In regard to plaintiffs' § 1981 claims, defendant's objections are unfounded. Unlike § 1985, § 1981 creates substantive rights which may be redressed in a federal court without regard to whether Title VII remedies are pursued or whether there has been compliance with Title VII jurisdictional prerequisites. The two statutes are completely independent, and a plaintiff can maintain both a Title VII and a § 1981 action arising out of the same set of facts. *Johnson v. Railway Express Agency*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1974). *See also, Great American v. Novotny*, supra, specifically distinguishing between §§ 1985(c) and 1981.

*V. The Statute of Limitations*

 Defendant contends that each of the individual incidents in which a class member claims to have been misled or deceived by union officials concerning the possibility of securing a position as a laborer occurred before 1972,[22] and that plaintiffs' claims under both Title VII and § 1981 are thus barred by the statute of limitations. The statute of limitations for § 1981 is provided by state law, *see Johnson v. Railway Express Agency*, 421 U.S. at 462, 95 S.Ct. 1716, and the applicable period in New York is

---

19. It is not clear from defendant's brief whether this objection is limited to the Ingram § 1985 claim or whether it is addressed to all of the § 1985 claims involved herein. Since the matter goes to this Court's power to hear these claims, we treat it as an objection to the § 1985 claims generally.

20. The *Novotny* holding was also based on the Court's conclusion that § 1985 does not itself create any substantive rights but merely provides a remedy for the infringement of other federal rights. Since Title VII explicitly provides its own remedial scheme, it is not one of these federal rights which may be redressed by § 1985.

21. There is thus no need here to address the question of whether *Novotny* would apply in a case where a plaintiff's claims in fact "transcend" Title VII.

22. In fact, at least one witness, Ricardo Esparra, a cleaner at the Garden, testified at trial that he had asked Mel Mullins, the Local 3 shop steward, about becoming a laborer sometime during 1978, but that he "never got anywhere". Shelly Anderson, a cleaner at the Garden and another witness at trial, testified that he went to the union office in 1972 or 1973 to seek a position as a laborer. Although the timing of such individual incidents is irrelevant for statute of limitations purposes in light of the conclusion reached below, the Court finds that these witnesses did make inquiries about becoming laborers at the time alleged, and that no clear responses were forthcoming.

three years. *See Keyse v. California Texas Oil Co.*, 590 F.2d 45 (2d Cir. 1978); *Cates v. Trans-World Airlines, Inc.*, 561 F.2d 1064, 1067 n.4 (2d Cir. 1977). The limitations period for Title VII is found at 42 U.S.C. § 2000e–5(e), which provides that an EEOC charge must be filed within 180 days of the alleged discriminatory act, or within 300 days if the charge is first referred to a state agency. The Ingram plaintiffs, who rely solely on § 1981, commenced their action in December of 1976. The Anderson plaintiffs, who rely on both Title VII and § 1981, filed EEOC charges on November 24, 1975, and commenced their law suit, including their § 1981 claim, on March 31, 1978.

Even if defendants were correct in their claim that the individual incidents alluded to at trial preceded the limitations period, the argument misses the point. What plaintiffs challenge, and what is at the heart of this law suit in its present form, is a referral policy continuously adhered to by the defendant which operates to exclude class members from the Garden laborer force. Since the plaintiffs allege a continuous and present practice of discrimination rather than a single, isolated act, the statute of limitations is no bar. *Acha v. Beame*, 570 F.2d 57 (2d Cir. 1978).

## VI. The Composition of the Class

In his closing argument to the Court at trial, defendant's counsel raised the question whether a union such as Local 3 could be held to a "duty" under Title VII or § 1981 to recruit laborers from a class composed entirely of members of another union. This argument cannot withstand close scrutiny.

■ As a practical matter, as we have noted *supra* at pages 420–421, defendant suffers no disadvantage by referring class members to the Garden, particularly given Local 3's current referral policy. But more importantly, defendant union seems to misconstrue the nature of its duties under the employment discrimination laws. Under those statutes, a union which takes part in

the hiring process is obligated to do so in a manner which does not discriminate on the basis of race, ethnicity or sex. (See discussion and cases cited in the next section.) That "duty" is not limited to union members, and it is not inapplicable to those who belong to another union; it is a duty which runs to all those who are or might be affected by its breach. *See Arnold v. Consolidated Freightways, Inc.*, 399 F.Supp. 76 (S.D.Tex.1975) (a union does not have to be the collective bargaining agent for a plaintiff employee in order for it to be subject to § 1981 liability). In this case, plaintiff classes, while they obviously do not encompass the entire potential black and hispanic work force for laborers, were composed of those people who, in the Court's judgment, were most likely to seek a laborer's position, and who were therefore most likely to be effected by Local 3's referral policy.[23]

## VII. Title VII and Section 1981 Liability

■ It is well established that § 1981, as well as Title VII, affords a federal remedy against discrimination in private employment, *see Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1974) and that the statute applies to acts of discrimination by unions as well as by employers. In applying § 1981 to employment discrimination cases, courts have almost universally applied Title VII standards and principles, and this Circuit has explicitly held that no greater or lesser protection from employment discrimination is provided by § 1981 than is provided by Title VII. *See Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir. 1976). Thus, in the discussion that follows, plaintiffs' Title VII and § 1981 claims will be treated together, and proof that establishes a violation of one will be taken as proof of a violation of the other.

■ A Title VII or § 1981 violation can be based on proof of either "disparate treatment" or "disparate impact". Plaintiffs argue that both are present here and the

---

**23.** They were on the premises, observed the laborers performing duties which they felt qualified to perform and were aware of the pay and benefit differentials.

Court agrees. The Court finds that Local 3's referral policies violated both Title VII and § 1981.

### A. Disparate Impact

■ The disparate impact line of Title VII analysis stems from the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1973). Essentially, if the criteria used by an employer or union to determine job eligibility "operate to exclude" minority members, then despite a lack of discriminatory intent, a *prima facie* case of employment discrimination is made out and the burden shifts to the employer or union to demonstrate a substantial relationship between the criteria and job performance. *See Alvarez-Ugarte v. City of New York*, 391 F.Supp. 1223 (S.D.N.Y.1975). The courts of this Circuit have described this burden as "heavy", and as a burden of persuasion rather than simply a burden of going forward with the evidence. *Vulcan Society of New York City Fire Dept. v. Civil Service Commission*, 490 F.2d 387 (2d Cir. 1973); *Alvarez-Ugarte, supra.*

■ Local 3's standardless and for the most part implicit policy of limiting referrals largely to personal friends or acquaintances of its business agent and laborer representative, James O'Hara, clearly operated to exclude the minority employees who make up the plaintiff classes. While less than 16% of the referrals [24] during Mr. O'Hara's tenure involved blacks or hispanics (none of whom were cleaners), the combined percentage of blacks and hispanics in the labor market surrounding the Garden is somewhere between 26% and 34%.[25] Such a statistical disparity is alone, of course, insufficient to establish a Title VII violation. But statistics are of recognized importance in employment discrimination cases and, under some circumstances, may be sufficient to establish a *prima facie* case. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975). In this case, moreover, the inference of discrimination raised by the statistics is bolstered by the fact that Local 3's referral "system" was completely standardless and ultimately reliant on "word of mouth" recruitment, both of which have been universally criticized by the courts as tending to perpetuate segregated and discriminatory employment patterns. *See, e. g., Barnett v. W. T. Grant Co., supra* (word of mouth hiring perpetuates a white work force; lack of objective standards always suspect); *Pennsylvania v. Local Union 542 International Union of Operating Engineers*, 469 F.Supp. 329 (E.D.Pa.1978) (statistical disparity plus arbitrary handling of referrals by union results in a Title VII violation); *EEOC v. Radiator Specialty Co.*, 16 EPD

---

**24.** At least one of these minority referrals occurred after this law suit commenced, and all took place after January of 1970. If the one referral which occurred in 1978 is not considered, the percentage of minority referrals drops to less than 14%, or 5 out of 37.

**25.** All figures are based on the 1970 census and were offered by plaintiffs. The first figure is for the "Standard Consolidated Area" and includes New York City, Newark, Jersey City, Patterson-Clifton-Passaic, and Middlesex and Somerset Counties in New Jersey. The second figure represents the percentage of blacks and hispanics in the New York City labor force. A third figure offered by the plaintiffs is 27.4% for the "Standard Metropolitan Statistical Area", which includes the five counties of New York City, Rockland and Westchester Counties, New York and Bergen County, New Jersey. Since both laborers and cleaners are essentially unskilled or semi-skilled employees with no particular job qualifications, the unrestricted total work force statistics offered by plaintiff are sufficient. *See EEOC v. International Union of Elevator Constructors, Local Union No. 505*, 398 F.Supp. 1237 (E.D.Pa.1975); *aff'd sub nom. United States v. International Union of Elevator Constructors, Local Union No. 505*, 538 F.2d 1012 (3d Cir. 1976).

The inference of discrimination drawn by the statistical disparity present here is supported by the testimony of Dr. Beth Niemi, a labor economist at Rutgers who testified for the plaintiffs. Dr. Niemi testified that given the statistics described above, there is less than a one in one thousand chance that the laborer and cleaner work forces as presently constituted could have been drawn from the same labor market, *i. e.*, that only some factor other than chance could cause a work force with the racial composition present here to be drawn from the total labor market.

8276 (W.D.N.C.1978) (word of mouth hiring plus failure to post job vacancies corroborate inference raised by the statistical pattern); *Neely v. City of Grenada,* 438 F.Supp. 390 (N.D.Miss.1977) (same).

Looking to the statistical disparity and the surrounding circumstances, *see Teamsters v. United States, supra,* 431 U.S. at p. 338, 97 S.Ct. 1843, it is clear that plaintiffs have established a *prima facie* case of a Title VII· and a § 1981 violation by defendant union Local 3. Defendant has offered no evidence of a "business justification" other than to point out that plaintiffs belonged to a "rival union". This argument has been discussed and dismissed above, but in any case, a requirement that an applicant for referral not belong to a rival union would not be substantially related to job performance. Since defendant has not rebutted plaintiffs' *prima facie* case, the proof of disparate impact is sufficient to establish a violation of the two employment discrimination statutes involved herein.

*B. Disparate Treatment*

In a disparate treatment case, the critical issue is proof of a discriminatory motive. *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). While the plaintiffs have the initial burden to establish a *prima facie* case, that burden is satisfied by a showing similar to that required in the disparate impact cases: proof of discriminatory motive can rest on a statistical disparity plus an examination of the surrounding circumstances. *Teamsters v. United States,* supra, at 338, 97 S.Ct. 1843. Thus, the evidence discussed above is sufficient to establish a Title VII or § 1981 violation based on disparate treatment, as well as on disparate impact.

*VIII. Relief*

Plaintiffs seek an injunction ordering Local 3 to standardize its referral practices with respect to class members by maintaining a register of class members seeking referral for the job of laborer and by conspicuously posting within the Garden notice of how to register for such a referral.

Plaintiffs also request that the union be ordered to refer to the Garden class members seeking a laborer's position in order of their current seniority, and that after referral, such employees should be credited with full seniority for all purposes for the same number of years that the class member involved worked as a cleaner. Finally, plaintiffs seek back pay for all class members who unsuccessfully applied for a laborer's job, and for all class members who would have applied but for the belief that such application would be futile. Reasonable attorney's fees and costs are also sought.

Only the issue of Local 3's liability has been tried thus far, but it is clear that plaintiffs' demand for retroactive seniority for those cleaners who ultimately become laborers will dominate the remedial stage of these proceedings. The parties are directed to appear before this Court on October 17, 1979 for a hearing on all remedial issues, particularly whether the circumstances here are appropriate for an award of retroactive seniority. *See Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transport Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). If the Court finds that such relief is appropriate, it will at that time establish a procedure for making the individual determinations necessary to decide which class members were "actual victims of . . . discriminatory practices". *Teamsters v. United States,* 431 U.S. at 371–372, 97 S.Ct. 1843.

SO ORDERED.