Henry INGRAM, James Britt, William Moody, and Roy T. Floyd, individually and on behalf of all persons similarly situated, Plaintiffs-Appellees,

and

Frances Williams, Edward Milon, Horace Mitchell, Herbert Bruton, Jovino Garcia, Intervenors,

v.

MADISON SQUARE GARDEN CENTER, INC., Madison Square Garden Corporation, Allied Maintenance Corporation and Allied Public Events Service Corporation, Defendants,

and

Local Union No. 3, IBEW, AFL–CIO, Defendant-Appellant.

Shelly L. Anderson, James L. Perry, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

Madison Square Garden Center, Inc., Madison Square Garden Corporation, Allied Maintenance Corporation, Allied Public Events Service Corporation, Local 54, Service Employees International Union, Defendants,

and

Local Union No. 3, IBEW, AFL–CIO, Defendant-Appellant.

No. 308, Docket 82–7384.

United States Court of Appeals, Second Circuit.

Argued Nov. 15, 1982.

Decided June 13, 1983.

Certiorari Denied Oct. 31, 1983.

See 104 S.Ct. 346.

Norman Rothfeld, New York City, for defendant-appellant.

Lewis Tesser, New York City, for plaintiffs-appellees.

Before VAN GRAAFEILAND, MESKILL and PRATT, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Local 3 of the International Brotherhood of Electric Workers appeals from a judgment of the United States District Court for the Southern District of New York (Sand, J.) which awarded plaintiffs in a class employment discrimination suit retroactive seniority rights with back pay, front pay, and attorneys' fees, the total monetary award, with interest, being substantially in excess of $1 million. Four opinions written by the district court are reported at 482 F.Supp. 414, 482 F.Supp. 426, 482 F.Supp. 918; and 535 F.Supp. 1082. Although we find the evidence of discrimination somewhat less persuasive than did the district court, we are not prepared to hold that the district court's findings on this issue were clearly erroneous. *See Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Accordingly, we affirm

the district court's adjudication of liability. However, for reasons hereafter discussed, we find it necessary to modify the relief which the court below granted.

Since 1965, Local 3 of the International Brotherhood, which has more than 4,300 black and Hispanic members, has represented the "maintenance group of utility men" (hereafter "laborers") at Madison Square Garden. These laborers prepare the Garden for its various featured events. The several contracts between the Union and the Garden placed no restrictions on the employer's method of hiring, merely requiring that all laborers become members of the Union within 31 days of their employment. However, in practice, the hirelings, of which there was an average of about 5 per year, were referred to the Garden by the Union representative for the Garden laborers. About 1 in 6 of the hirelings was either black or Hispanic.

Until 1969, the Garden also employed other groups of people as cleaners or porters, bowling alley and lavatory attendants, and elevator operators. In 1969, the Garden subcontracted its cleaning work to Allied Maintenance Corporation, retaining only the elevator operators as its own employees. All of the cleaners are represented by Local 54 of Service Employees International Union, and most of them are either black or Hispanic.

On August 13, 1973, appellees Ingram, Britt, Moody, and Floyd, all of whom were porters working at the Garden, filed charges against the Garden and Allied with the Equal Employment Opportunity Commission, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that these employers had discriminated against them and other black porters by paying them less than the white laborers for doing similar work and by maintaining segregated job classifications. The EEOC concluded that the Garden and Allied were violating Title VII, and, on October 4, 1976, following unsuccessful conciliation efforts, issued right-to-sue letters to the four complainants. On December 30, 1976, the porters filed a proposed class action suit against the Garden and Allied, alleging violations of 42 U.S.C. §§ 1981 and 1985 as well as Title VII. On June 22, 1977, Local 3 was added to the litigation by means of an amended complaint, which charged that the Union was discouraging competent minority cleaners from seeking and obtaining jobs as laborers and was conspiring with the Garden and Allied towards this end by advising cleaners that the Garden was solely responsible for hiring, that no jobs were available, and that cleaners must do apprenticeships before becoming members of Local 3.

On November 24, 1975, appellees Anderson and Perry, black porters who worked at the Garden, also filed discrimination charges with the EEOC, their charges being directed against the Garden, Allied, and Local 3. On January 16, 1978, a right-to-sue letter issued, and on March 31, 1978, a proposed class action complaint on behalf of the Anderson group was filed.

The district court certified a Title VII class and a §§ 1981 and 1985 class in both actions. In the *Ingram* action, the Title VII class, whose claims, of necessity, were limited to the Garden and Allied, consisted of all blacks who, after February 14, 1973, had been or would be employed as cleaners at the Garden. The §§ 1981 and 1985 class consisted of all blacks and Hispanics who, after December 30, 1973, had been or would be employed as cleaners at the Garden. Certification of both classes in *Ingram* was conditioned on the intervention of lavatory and bowling alley attendants and elevator operators as named plaintiffs. Thereafter, Williams, a black lavatory attendant, Milon, a black bowling alley attendant, Mitchell, a black elevator operator, Bruton, a retired black cleaner, and Garcia, an Hispanic cleaner, intervened. The *Anderson* classes were defined in the same manner as those of *Ingram,* except that the Title VII *Anderson* class limitation was May 28, 1975, and the §§ 1981 and 1985 *Anderson* class limitation was March 31, 1975, and both classes claimed against the Garden, Allied, and Local 3.

On July 13, 1978, the *Ingram* and *Anderson* actions were consolidated. On July 16, 1979, the district court denied the Union's motion to decertify the classes. Subsequently, the plaintiffs entered into a proposed consent decree with the Garden and Allied, in which the defendants agreed, among other things, to pay $117,500 in settlement of plaintiffs' monetary claims plus $47,500 in attorneys' fees. On October 23, 1979, the settlement was approved by the district court, subject only to the submission of an affidavit in support of counsel fees. *See* 482 F.Supp. at 426. In the meantime, the case had proceeded to trial against Local 3, the issue being limited to that of liability.

On October 3, 1979, in an opinion reported at 482 F.Supp. 414, the district court dismissed plaintiffs' § 1985 claims, relying on *Great American Federal Savings & Loan Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), but held the Union liable under both Title VII and § 1981.

*Liability*

Evidence introduced at trial showed that the percentage of male, non-farm black and Hispanic workers in the Standard Consolidated Area, which includes New York City, Newark, Jersey City, Patterson-Clifton-Passaic, and Middlesex and Somerset Counties in New Jersey, was 25.6%, and, in the Standard Metropolitan Statistical Area, which includes the 5 counties of New York City, Rockland and Westchester Counties in New York, and Bergen County in New Jersey, was 27.4%. It appears from the provisions of the consent decree that both the district court and plaintiffs' attorneys accepted 27% as an appropriate figure. Other evidence before the district court showed that, between 1965 and 1977, Local 3 referred 66 laborers to the Garden and that 10, or 15%, of these were either black or Hispanic. Referrals by the Union of only 7 additional blacks or Hispanics would have raised its minority referral percentage to approximately 26%. Between 1972 and 1975, the number of laborers employed at the Garden varied between 59 and 71. During 1972 and 1973, 7 of these were black or Hispanic; during 1974 and 1975, 8 were black or Hispanic. Again, an increase of only 7 blacks or Hispanics would have altered the racial composition of Garden laborers so that it approximated that of the general Metropolitan area.

■ Statistical evidence of discrimination based on but a few numbers is not, standing alone, compelling evidence of wrongdoing. *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Eubanks v. Pickens-Bond Constr.,* 635 F.2d 1341, 1345–50 (8th Cir.1980); *Morita v. Southern California Permanente Medical Group,* 541 F.2d 217, 220 (9th Cir.1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977). In the instant case, for example, the district court observed that one less minority referral by the Union in 1978 would have dropped the percentage of minority referrals from 16% to 14%. 482 F.Supp. at 424 n. 24. Nevertheless, the district court drew an inference of discrimination from the "statistical disparity" evidenced by the figures, *id.* n. 25, and found that Local 3 "hired [sic] blacks or Hispanics ... in numbers significantly below their percentage in the labor market surrounding the Garden." 535 F.Supp. at 1094. We do not find as much significance in these figures as did the district court. *See Coble v. Hot Springs School District,* 682 F.2d 721, 734 (8th Cir.1982); *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5th Cir. 1979), *cert. denied,* 449 U.S. 858, 101 S.Ct. 159, 66 L.Ed.2d 74 (1980); Diedrich and Gaus, *Defense of Equal Employment Claims* ¶ 13.11 at 361 (1982). However, the district court did not rely on this evidence alone. It found, among other things, that the efforts of several class members to secure laborers' positions "were deliberately frustrated by union personnel who, on a number of occasions, either ignored, gave evasive answers to or just generally gave the run-around to class members who

sought information from them as to how to become a laborer", and that this " '[got] the message across' and created an atmosphere which discouraged class members from actively seeking a laborer's position." 482 F.Supp. at 421. Although, as the district court itself stated, "the number of these incidents was not great," 482 F.Supp. at 421, the court coupled them with the "statistical disparity" and the "standardless" method of referral to support a finding of discriminatory intent, 535 F.Supp. at 1087. Although we might have reached a different conclusion, we cannot say that the district court clearly erred.

We find no merit in appellant's other challenges to the adjudication of liability. The test for error in class certification is abuse of discretion, *Brick v. CPC Int'l, Inc.*, 547 F.2d 185, 187 (2d Cir.1976), and there was no abuse in the instant case. The district court applied the correct statute of limitations. *Keyse v. California Texas Oil Corp.*, 590 F.2d 45, 47 (2d Cir.1978). Appellant's other contentions require no discussion.

### The Back Pay Award

In fashioning a remedy for employment discrimination, "the court must, as nearly as possible, 'recreate the conditions and relationships that would have been had there been no' unlawful discrimination." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977) (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976)). We believe that the remedy in the instant case went beyond that.

The district court referred the factual remedial issues to a Magistrate and instructed the Magistrate to award seniority to every class member who desired a laborer's job as of the date of the next laborer hire that followed his application or "qualifying desire", subject to a maximum date of July 2, 1965. 482 F.Supp. at 923–24. The court instructed the Magistrate to make back pay awards on the same basis, subject to the 2-year limitation period of Title VII and the 3-year limitation period applicable in New York to § 1981. *Id.* at 925–26. The computations, made as directed, produced some interesting results. Two class members were awarded retroactive competitive seniority dates to 1970, a year in which 5 laborers were hired, one of whom was Hispanic. If the district court was recreating the conditions that would have existed had there been no discrimination, presumably he intended that three of the five 1970 hirelings should have been either black or Hispanic. In 1974, 6 laborers were hired, one of whom was black. Nevertheless, 4 class members were awarded retroactive competitive seniority to 1974. In recreating the conditions for that year, the district court must have intended that 5 out of the 6 hirelings should have been either black or Hispanic. Although only one laborer, a white man, was hired in 1976, seniority retroactive to 1976 was awarded 4 class members.

According to appellees' own computations, in 1969, the laborer work force at the Garden consisted of 48 whites, 2 blacks and 2 Hispanics. Appellees' Brief at 9. Between 1970 and 1978, the Garden hired 33 laborers referred to it by the Union, of whom 6 were either black or Hispanic. *Id.* at 8. The minority hiring rate during these years was thus 18.2%. The district court held that, for purposes of retroactive competitive seniority, 17 class members should have been hired during this period, for purposes of non-competitive seniority, 10 class members should have been hired, and for purposes of back pay awards, 13 class members should have been hired. Had 17 class members been hired, the racial composition of labor hirings during this period would have been 69% black or Hispanic. Had 13 class members been hired, the composition would have 57% black or Hispanic. Had 10 been hired, 48% of the hirelings would have been black or Hispanic. This is hardly a recreation of the conditions that would have existed had there been no discrimination.

A court that finds unlawful discrimination is not required to grant retroactive relief. *City of Los Angeles v. Manhart,* 435 U.S. 702, 718, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978). "To the point of redundancy, the statute stresses that retroactive relief 'may' be awarded if it is 'appropriate.'" *Id.* at 719, 98 S.Ct. at 1380. Moreover, such remedy as is given should not constitute a windfall at the expense of the employer, its union, or its white employees. *See United States v. United States Steel Corp.,* 520 F.2d 1043, 1055 (5th Cir.1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Guardians Ass'n of the New York City Police Dept. v. Civil Service Commission,* 539 F.Supp. 627, 630 (S.D.N.Y. 1982); *Patterson v. Youngstown Sheet and Tube Co.,* 475 F.Supp. 344, 354 (N.D.Ind. 1979), *aff'd,* 659 F.2d 736 (7th Cir.), *cert. denied,* 454 U.S. 1100, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). Title VII imposes no duty to maximize the hiring of minority employees. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). Remedial relief should be granted only to those class members who would have filled vacancies had there been no discrimination. *See Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 284–87 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). The district court's judgment, based on the concept that all class members with unexpressed employment desires should have been hired regardless of the number of vacancies and competing applicants, is based upon a hypothetical hiring practice which the law did not require and which, in actuality, never would have been followed absent any trace of discrimination.

James O'Hara, the Union representative for the Garden laborers and the person who made job referrals, received over 300 requests for jobs during the period at issue, not a single one of which came from a class member. There is nothing in the record to indicate that, discrimination aside, class members would have been given preference over other applicants. Indeed, since the Union counted 4,300 blacks and Hispanics among its own members, it is unlikely that preferred treatment would have been given to members of another union. In view of the limited number of vacancies that occurred, we conclude that, to the extent that back pay was awarded to more than 7 class members, it constituted an unwarranted windfall and did not recreate the conditions that would have existed in the absence of discrimination.

Because of the statistical limitations inherent in the small samples available to plaintiffs' expert witness, her testimony concerning disproportionate hiring did not focus on any particular year. Faced with the same limitations, neither this Court nor the district court can state accurately when the 7 class members should have been hired. Under such circumstances, we think it would be inequitable to award back pay to only the first 7 class members who indicated a "desire" to become laborers. The fairer procedure, we believe, would be to compute a gross award for all the injured class members and divide it among them on a pro rata basis. *See Stewart v. General Motors Corp.,* 542 F.2d 445, 452–53 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 n. 154 (5th Cir.1974). In determining the amount of the gross award, however, we think it fair to both the Union and the class members to assume that the Union would have referred the 7 class members who first desired employment, had they applied, and to base the class award on the loss attributable to these 7 men.

The first 7 "applicants", determined by their seniority dates, and the back pay awards made them by the district court, are:

| | | |
|---|---|---|
| 1. | Clarence Lamar | $ 55,120 |
| 2. | Wilfred Boudreaux | 51,010 |
| 3. | William Moody | 53,298 |
| 4. | Herbert Holmes | 57,604 |
| 5. | Henry Ingram | 27,202 |

6. Kenneth Williams .......... $ 61,494
7. James Britt ............... 39,988

$345,716

The total award to these men, $345,716, is equal to approximately 52.14% of the total award of $663,085 which the district court made to all 18 back pay recipients. Proration by 52.14% of the 18 individual awards produces the following figures:

1. Shelly Anderson ........... $ 16,578.43
2. Wilfred Boudreaux ......... 26,596.61
3. James Britt ............... 20,849.74
4. John Carroll .............. 9,630.78
5. Russell Footman ........... 11,123.03
6. Waverly Green ............. 10,675.67
7. Graydon Griffith .......... 18,963.84
8. Lawrence Hawkins ......... 24,746.17
9. Francisco Hernandez ....... 23,836.84
10. Herbert Holmes ........... 30,034.73
11. Henry Ingram ............. 14,183.12
12. Clarence Lamar ........... 28,739.57
13. William Moody ............ 27,789.58
14. James Parrott ............. 19,611.94
15. James Perry .............. 8,775.16
16. James Pettigrew ........... 11,628.78
17. George Sharpe, Sr. ........ 9,905.56
18. Kenneth Williams .......... 32,062.97

$345,732.52

The district court's award of back pay is modified in accordance with the foregoing figures.

### Front Pay

Since this action was begun, at least 6 class members to whom the district court made back pay awards have been hired by the Garden, 5 of them on November 5, 1979, and one on December 20, 1980. The district court has indicated that it intends to make front pay awards for future losses to the twelve remaining back pay recipients. For the reasons already expressed, we believe it is completely unrealistic to assume that all 18 back pay beneficiaries would have been hired had there been no discrimination practiced against them. Accordingly, we deem it unfair to the members of the defendant Union, black, Hispanic, and white, to impose a continuing liability upon their association for the loss of future benefits. This unfairness is exacerbated by the fact that the Union has no control over future hirings, which are the sole prerogative of the Garden, and is therefore in no position to bring its liability for front pay to an end. Under these circumstances, we believe that it would be an abuse of discretion for the district court to make front pay awards against the Union to class members not already hired.

### Retroactive Seniority

The same factors which dictate the limitation of back pay and front pay awards also militate against the grant of retroactive seniority to future hirelings. In addition, we view pendent grants of retroactive seniority as self-defeating, in that they militate against the likelihood that the beneficiaries of the grants will be employed. Under the consent decree which terminated plaintiffs' action against the Garden, the Garden agreed that every second job opening would be offered to minorities until their representation among the Garden's laborers reached 27%. 482 F.Supp. at 417 n. 4. Because at least 9 minority laborers have been hired since the execution of the consent decree, 6 of whom were class members, it is not at all unlikely that the 27% quota has been reached and the compulsory hiring of class members has come to an end. Relations between the Garden and its presently employed laborers will not be improved by the voluntary hiring of additional class members who will be granted automatic seniority under the terms of the district court's judgment. For all the foregoing reasons, we think that the proper exercise of discretion would limit the grant of retroactive seniority to the 6 or more class members already hired.

### Attorneys' Fees

Like the steamfitters union in *Rios v. Enterprise Ass'n Steamfitters Local 638,*

400 F.Supp. 993 (S.D.N.Y.1975), *aff'd in relevant part,* 542 F.2d 579 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), the Union is a non-profit association comprised primarily of members who earn their living with their hands. It is upon these members that the burden of the award against the Union for attorneys' fees eventually will fall. Instead of exploring this matter before the Magistrate to whom the question of fees was referred, defense counsel, in the Magistrate's words, spent his time in a "vexatious, time-wasting attack on plaintiffs' counsel and in an unfruitful, nitpicking excursion through innocuous details and markings in plaintiffs' counsels' time logs and records."

Despite the truth of this observation, we are aware that the Union cannot pass on to customers the expense of plaintiffs' attorney's fees, *see Hall v. Cole,* 412 U.S. 1, 15 n. 23, 93 S.Ct. 1943, 1951 n. 23, 36 L.Ed.2d 702 (1973), and this places special emphasis upon our duty to see that the liability imposed upon the Union does not include a windfall for plaintiffs' attorney. Although fee awards are generally within the discretion of the district court, this Court may intervene where that discretion has been abused. *Faraci v. Hickey-Freeman Co.,* 607 F.2d 1025, 1028 (2d Cir.1979); *Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34, 37–38 (2d Cir.1978).

We have no problems with the allowance to plaintiffs' attorney, Lewis Tesser, based upon 1,280 hours at $100 per hour. Both figures are reasonable and are supported by the evidence. The allowance for the work performed by Mr. Tesser's assistant, Marjorie Altman, presents a different situation. Miss Altman, who was admitted to practice in March 1978, was employed by Mr. Tesser at a salary of $200 per week. Mr. Tesser conceded, moreover, that Miss Altman put in "significantly"

more than 50 hours per week. The Magistrate allowed Mr. Tesser $50 per hour for the work done by Miss Altman in 1978 and $65 per hour for the several ensuing years, stating that these rates "were *lower* than the going rates for attorneys of like skill and experience in the area" as testified to by Mr. Tesser's expert witness, Kathleen Peratis, Esq. (emphasis in original). This was not so. Miss Peratis testified that, for an attorney with 0 to 4 years' experience, a reasonable rate would be "from $35 to $65 an hour." We conclude that, insofar as Miss Altman's hourly rate for 1978 exceeded $35, the 1979 rate exceeded $45, and the 1980 rate exceeded $55, Mr. Tesser was the recipient of an unwarranted windfall. The allowance for counsel fees, including interest, is reduced by a total of $15,997.14.

The judgment of the district court is modified by:

(1) Reducing the individual back pay awards in accordance with the figures above set forth;

(2) Deleting the provision for future front pay awards;

(3) Deleting the provisions for the grant of retroactive seniority to class members hereafter hired;

(4) Reducing the award for attorneys' fees by $15,997.14.

As so modified, the judgment is affirmed without costs to either party.