Henry INGRAM, James Britt, William Moody, and Roy T. Floyd, individually and on behalf of all persons similarly situated, Plaintiffs,

and

Frances Williams, Edward Milon, Horace Mitchell, Herbert Bruton, Jovino Garcia, Intervenors,

v.

MADISON SQUARE GARDEN CENTER, INC., Madison Square Garden Corporation, Allied Maintenance Corporation, Allied Public Events Service Corporation, and Local # 3 I. B. E. W., Defendants.

Shelly L. ANDERSON, James L. Perry, individually and on behalf of all others similarly situated, Plaintiffs,

v.

MADISON SQUARE GARDEN CENTER, INC., Madison Square Garden Corporation, Allied Maintenance Corporation, Allied Public Events Service Corporation, Local 3 I. B. E. W., Local 54, Service Employees International Union, Defendants.

Nos. 76 CIV 5870 (LBS), 78 CIV 1453 (LBS).

United States District Court, S. D. New York.

March 23, 1982.

Lewis Tesser, New York City, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, Howard S. Veisz, New York City, for defendants Madison Square Garden Center, Inc. and Madison Square Garden Corp.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, Robert Ellenport, New York City, for defendants Allied Maintenance Corp. and Allied Public Events Service Corp.

Menagh, Trainor & Rothfeld, Norman Rothfeld, New York City, for defendant Local Union No. 3, I.B.E.W.

## OPINION

SAND, District Judge.

This is the latest Opinion in a case which has spawned numerous Opinions. Although the background of this litigation has been summarized in these prior Opinions of the Court, a general restatement of the factual context of this case is appropriate at this concluding stage of the proceedings. For a more detailed discussion of the facts of this case, *see Ingram v. Madison Square Garden Ctr., Inc.,* 482 F.Supp. 414 (S.D.N.Y.1979).[1]

Two separate cases were brought by two classes, which together comprise all black and Hispanic persons who have been or will in the future be employed as "cleaners" by the defendants Madison Square Garden Center, Inc. ("Center, Inc."), Madison Square Garden Corporation ("Garden Corp."), Allied Maintenance Corporation ("AMC"), and Allied Public Events Service Corporation ("Allied"). Local # 3, International Brotherhood of Electrical Workers ("Local 3", "the union," "the defendant") was also named as a defendant in these actions.

Plaintiffs allege that the defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Civil Rights Act of 1866 and 1871, 42 U.S.C. §§ 1981 and 1985 respectively, by engaging in a pattern of hiring and employment practices which made it impossible for class

---

1. The many Opinions filed in this case will be cited simply as *"Ingram,"* followed by reference to reporter volume and page number. Where appropriate, Opinions will be referred to simply by date of filing.

members to secure the higher paying and generally more desirable position of "laborer" at Madison Square Garden ("the Garden"). Prior to the trial, Center, Inc., Garden Corp., AMC and Allied all entered into a proposed Consent Decree which was subsequently approved by the Court. *See Ingram*, 482 F.Supp. 426 (S.D.N.Y.1979). The consolidated trial of the two actions was limited to the issue of Local 3's liability under the employment discrimination statutes involved.

In its Opinion of October 3, 1979, the Court dismissed the plaintiffs' § 1985 claims and dealt with the various jurisdictional and statute of limitations issues which the defendant interposed as defenses. *See Ingram*, 482 F.Supp. 414 (S.D.N.Y. 1979). The Court held that the manner in which Local 3 referred workers to the Garden for employment as laborers violated both Title VII and § 1981. The Court agreed with the plaintiffs' contention that the union, which is the bargaining agent for the laborers at the Garden, and which referred prospective employees to the Garden for employment as laborers, employed a completely subjective and standardless referral policy, relying almost entirely on word of mouth favoritism, that operated to discriminate against class members by preventing them from becoming laborers. The Court found that the plaintiffs in the first of the two consolidated class actions, the "Ingram" plaintiffs, were entitled to recover under § 1981 only, while the plaintiffs in the second action, the "Anderson" plaintiffs, were entitled to recover under both Title VII and § 1981.

On December 13, 1979, the Court filed an Opinion establishing guidelines with respect to damages, and found that, as a general matter, awards of backpay, retroactive seniority, and attorneys' fees are appropriate in this action. *See Ingram*, 482 F.Supp. 918 (S.D.N.Y.1979). Plaintiffs' request for prospective injunctive relief was granted, subject to certain modifications. The Court explained that class members could demonstrate that they are actual victims by proving a desire for referral as a laborer which was expressed to Local 3 or, alternatively, by proving that they were qualified for a laborer's position and that they would have applied for a referral had it not been for the discriminatory practices. *See id.* at 922–23. The case was referred to Magistrate Kent Sinclair, Jr. who, in accordance with the general standards outlined in the Opinion, was requested to make recommendations to the Court as to both the entitlement of individual class members to relief and the amount appropriately chargeable to the defendant for attorneys' fees and costs.

On April 18, 1980, the Magistrate issued "Preliminary Findings" as to retroactive seniority dates for class members who had obtained laborers' positions. These findings were affirmed by this Court on May 5, 1980 without prejudice to such review as the Court should choose to make at the end of the remedial process. *See Ingram*, Nos. 76–5870, 78–1453 (S.D.N.Y. May 5, 1980).

On November 21, 1980, the Magistrate issued "Findings of Fact" concerning the desire dates and other eligibility determinations respecting seniority for those class members who had come forward to request affirmative relief.

On December 8, 1980, Magistrate Sinclair issued an "Interim Order on Monetary Relief" containing a discussion of the backpay formula adopted therein and a summary of the status and expected treatment of open items in connection with the relief aspects of the litigation. The method of computing wage loss which the Magistrate adopted involved comparing each victim's actual compensation with the average compensation of an appropriate group of comparison laborers during the period of discrimination.

The Magistrate issued "Findings, Conclusions and Recommendations on Back Pay" on July 27, 1981, which contained his final recommendations with respect to relief other than attorney's fees. This report offered resolutions to the remaining remedy issues and proposed specific monetary awards for those class members who were found to be victims of Local 3's discriminatory referral policy.

On October 23, 1981, the Magistrate issued a "Report Containing Findings and Recommendations Re Plaintiffs' Fee Application." On November 10, 1981, the Magistrate filed two final Orders, one recommending a specific amount for attorneys' fees, and the other denying the defendant's motion to reopen the record.

All objections to Magistrate Sinclair's findings and recommendations have been deferred until the conclusion of the proceedings before the Magistrate. Both the plaintiffs and the defendant have now submitted such objections pursuant to 28 U.S.C. § 636(b) and the United States District Court for the Southern District of New York Rules for Proceeding Before Magistrates, Rule 7.

■ Before discussing these exceptions to the Magistrate's reports, we address the question whether the legal standard for a finding of § 1981 liability has changed since the Court found Local 3 liable under that statute in 1979. The Court will next consider defendant's motion to reopen the record in this action.

Legal developments since the time this Court issued its Opinion of October 3, 1979 require a further elaboration of the finding of liability under § 1981. Currently pending before the Supreme Court of the United States is a case which squarely poses the heretofore unsettled question of whether the establishment of a *prima facie* case of a § 1981 violation requires a showing of the defendant's intent to discriminate. *See Guardians Ass'n of New York City v. Civil Service Commission of the City of New York,* cert. granted —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). Most of the courts which have recently addressed this issue, including the Court of Appeals for the Second Circuit, have concluded that a § 1981 plaintiff must prove purposeful discriminatory intent. *See, e.g., Guardians Ass'n of New York City v. Civil Service Commission of the City of New York,* 633 F.2d 232 (2d Cir. 1980), *cert. granted* —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982); *Crawford v. Western Electric Co., Inc.,* 614 F.2d 1300, 1309 (5th Cir. 1980);

*Mescall v. Burrus,* 603 F.2d 1266 (7th Cir. 1979); *Des Vergnes v. Seekonk Water District,* 601 F.2d 9, 15–16 (1st Cir. 1979). The Court of Appeals for the Second Circuit concluded that "[o]bjectively viewed, the language, structure and history of § 1981 all point to the conclusion that the statute was simply intended to prohibit *purposeful* racial discrimination in a wide variety of circumstances, including but not limited to employment discrimination." *Guardians Ass'n, supra,* at 267 (emphasis added).

As was indicated in this Court's original liability Opinion, plaintiffs have met their burden of proof even under the heightened standard requiring a showing of discriminatory motive. *Ingram,* 482 F.Supp. 414, 425 (S.D.N.Y.1979). The statistical disparity between the percentage of black and Hispanic referrals and the percentage of these groups in the labor market surrounding the Garden, the standardless referral "system" employed by Local 3, the dependence on word of mouth recruitment, and the statements and demeanor of those who testified at trial, all convince the Court that the evidence is sufficient to establish a § 1981 violation based on a standard of discriminatory intent. For these reasons and because of the already protracted nature of these proceedings, we do not defer this decision because of the pendency of the *Guardians* appeal.

■ We consider next the defendant's motion to reopen the record in this action in order to put into evidence an affidavit concerning Local 3 referrals, a document labelled "Hiring List plaintiff class as of February 18, 1981, positive responses," and a letter from Garden counsel dated August 13, 1981. The Court, after hearing oral argument on the matter, is entirely in accord with Magistrate Sinclair's statements in his Order of November 10, 1981. No acceptable reason has been advanced by the defendant as to why these documents, which have either themselves been long available or which contain information which has long been available, could not have been the subject of a timely offer of proof. The defendant claims that some of

the proffered evidence relates to its argument that the plaintiffs' § 1981 case is time barred since the Court of Appeals for the Second Circuit may, in light of developing case law, reconsider its holdings as to the statute of limitations applicable to civil rights actions, and find that it is one year instead of three years. Aside from the purely speculative nature of defendant's assertion, such evidence is irrelevant in the context of this action. The discriminatory referral policy, which is the basis of defendant's liability, was continuously adhered to during all times relevant to the defendant's argument and was not a single, isolated act as to which even a one year statute of limitations might be a bar. *See Ingram*, 482 F.Supp. 414, 423 (S.D.N.Y.1979).

In light of the foregoing discussion, the Court sees no reason to reopen the record in this already protracted litigation. The defendant's motion is therefore denied.

## EXCEPTIONS TO THE MAGISTRATE'S REPORTS

The plaintiffs have made seven specific objections to Magistrate Sinclair's recommendations. Defendant has objected to virtually every one of the Magistrate's numerous adverse findings and has imposed upon the Court the burden of considering many misleading characterizations of the record as well as numerous patently absurd and frivolous arguments.

The Court, after *de novo* review of the evidence as to all matters as to which objections were made, approves all of the Magistrate's findings and recommendations except in the two instances specifically discussed below. This Court is of the opinion that the Magistrate's findings and recommendations have been based on an extremely thoughtful analysis of the issues presented, and a thorough and painstaking consideration of the evidence in the case. We discuss herein only those objections with respect to which further comment by the Court is deemed appropriate.

Defendant's first objection is that the proceedings before the Magistrate established the spuriousness of plaintiffs' class action. *See* Defendant Union's Exceptions to Magistrate Sinclair's Findings and Supporting Brief at 5–9 (hereinafter "Defendant's Objections"). Without reciting each of Local 3's characterizations of the evidence, suffice it to say that the Court adheres to its prior findings as to the validity of plaintiffs' proceeding in the form of class actions, as to Local 3's liability, and as to the reasonableness of a cleaner's belief that it would be futile for a class member to seek a laborer referral from Local 3. The Court merely notes that a particular plaintiff's post-trial decision as to whether or not to become a laborer is in no way dispositive of that individual's desires at an earlier time.

■ The Court rejects the defendant's contention that it "should not be burdened with a rebuttable presumption of discrimination with respect to each claimant." Defendant's Objections at 15. Local 3's attempts to draw a distinction between the burdens that should be imposed upon a discriminatory employer and a discriminatory union are unconvincing. Once Local 3's liability has been found, it is in the position of a proved wrongdoer. The same factors which would militate in favor of a rebuttable presumption against such an employer—*e.g.*, probability that decisions were made pursuant to the overall discriminatory pattern and superior access to proof—are equally applicable where it is found that a union has discriminated. *See Teamsters v. United States*, 431 U.S. 324, 359 n.45, 97 S.Ct. 1843, 1867 n.45, 52 L.Ed.2d 396 (1977) (hereinafter "*Teamsters*").

The defendant argues that "the claimants being nonapplicants were not entitled to Retroactive Seniority." Defendant's Objections at 19. The defendant relies primarily on language from *Teamsters, supra*, regarding the burdens on a nonapplicant seeking relief, and partially on cases construing § 703(h) of Title VII.

■ The defendant's resort to § 703(h) is misplaced, since that provision only immunizes certain seniority systems from the category of "unlawful employment prac-

tice(s)," and does not prevent the award of retroactive seniority as a remedial measure for other discriminatory practices. As the Supreme Court has stated: "There is no indication in the legislative materials that § 703(h) was intended to modify or restrict otherwise appropriate relief once an illegal discriminatory practice occurring after the effective date of the Act is proved." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 757–62, 96 S.Ct. 1251, 1260–62, 47 L.Ed.2d 444 (1976). In the case at bar, plaintiffs did not assert that the laborer seniority system in and of itself violated Title VII, but rather, plaintiffs seek retroactive seniority as a means of making persons whole for injuries they suffered.

■ As the defendant acknowledges, the Supreme Court explicitly stated in *Teamsters*:

> "We now decide that an incumbent employee's failure to apply for a job is not an inexorable bar to an award of retroactive seniority. Individual nonapplicants must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly."

*Teamsters*, supra, 431 U.S. at 365–66, 97 S.Ct. at 1869–70. Local 3 asserts that the nonapplicants have not met the difficult standard of showing that they were actual victims of the discriminatory referral practices, and that the award of retroactive seniority for the plaintiffs was "lightly recommended" by the Magistrate. Defendant's Objections at 25. The Court strongly disagrees with defendant's contentions. The extensive record fully supports the Magistrate's fact findings that, with one exception, each of the nonapplicants, for whom an award is recommended, desired a laborer's job, possessed the requisite qualifications, and would have sought a referral but for the union's discriminatory practices. These nonapplicants are therefore entitled to an award of retroactive seniority.

The defendant asserts that Local 3 may only be liable in damages if its membership participated in, authorized, or ratified the actions giving rise to liability. In support of this argument, defendant cites cases involving either New York law or federal law regarding the award of punitive damages. *See* Defendant's Objections at 9–11, and cases cited therein. The irrelevance of these situations to the issues presently before the Court need not be belabored here. The Court sees no reason to change its view that, as a general matter, unions may be subject to backpay awards. *See Ingram*, 482 F.Supp. 918, 925 (S.D.N.Y.1979).

■ Without directly responding to each of the defendant's objections to the Magistrate's general procedure for determining damages, this Court notes that it wholly endorses the Magistrate's methodology. As the plaintiff correctly contends: "The Magistrate's method was fair and was designed to reconstruct, as nearly as possible, the probable work history of each claimant absent discrimination." Plaintiffs' Memorandum in Reply to Defendant's Exceptions and in Opposition to Defendant's Motion at 17 (hereinafter "Plaintiffs' Reply"). Magistrate Sinclair's choice of laborers with whom to compare the plaintiffs for backpay purposes, his creation of Groups I through V, according to seniority, his assignment of particular plaintiffs into particular Groups, and the manner in which he reduced the award for those plaintiffs who did not use reasonable diligence in mitigating damages, were carried out in a just, sensible, and entirely correct manner. Local 3's exceptions amount to no more than an assertion that if the Magistrate had been pursuing different goals, had been presented with different facts, or had made less rational classifications or decisions, the union might have been assessed a lesser amount for backpay awards.

■ Local 3 posits several arguments in support of its contention that no backpay should be awarded against the union. First, the union asserts that this Court's pretrial approval of a backpay settlement made by plaintiffs and the other defendants indicates that plaintiffs have received total fair recompense for their injuries and should not be permitted to recover addition-

al sums from Local 3. The Court is still of the opinion that the settlement provided the plaintiffs with a fair recovery *from the settling defendants* at a time before any determination as to liability. The evidence adduced at trial and during the damages phase of the case firmly established Local 3's liability, and further demonstrated that the plaintiffs' total actual damages were far in excess of the amount which they recovered from the other defendants in the Consent Decree settlement. It is obvious that plaintiffs have not been fully recompensed, and the Court therefore finds this argument without merit.[2]

■ The union further argues that it should not be responsible for any backpay awards because Local 3 had no duty to represent the plaintiffs. This contention may be rejected summarily. Even though Local 3 did not have a duty as the exclusive representative of the plaintiffs, it is quite clear that, having assumed the role of the employment referral agency for the Garden, it had a duty to refer individuals for the position of laborer in a fair manner which did not discriminate on the basis of race or national origin. It is this duty which the union breached and which caused substantial harm to the plaintiffs.

■ Local 3 argues that "[i]f a backpay assessment were paid by the Garden's sixty laborers ... they would patently be bankrupt. If an assessment were levied against the Union membership at large, responsibility would thereby be imposed upon people who had no knowledge of the discriminatory acts, including Blacks and Hispanics...." Defendant's Objections at 37. If the defendant is contending that the amount of damages assessable against the union should be limited by the amount that the sixty individual laborers could themselves afford to pay, it cites no authority for that suggestion. If the defendant is arguing that only a local may be held liable

for union offenses with purely local effects, it likewise cites no legal authority for that proposition. The Court rejects both of these arguments. Plaintiffs' rights to damages sustained by virtue of defendant's discrimination is not limited to any amount by which the defendant or its members may be said to have benefitted. It is not because it has been unjustly enriched, but because of the extent of the damage it has inflicted, that the award has been recommended. Defendant's objection that members of other locals of the union will suffer because of the misdeeds of a single local is an objection which relates to the internal management and leadership of the defendant, but plaintiffs' right of recovery should not be diminished because of such concerns.

The defendant further cites several pre-*Teamsters* cases for the proposition that the applicable law of this Circuit does not permit the award of backpay to nonapplicants. Defendant's Objections at 31–33. This argument was explicitly discussed and rejected in this Court's remedy Opinion and need not be recounted here. *Ingram*, 482 F.Supp. 918, 925–26 & n.15 (S.D.N.Y.1979). In fact, since the time of that Opinion, the Court of Appeals for the Second Circuit has clearly stated that it does not view the precedent in this Circuit as a bar to an award of backpay damages to nonapplicants who have proved that they are actual victims. *See Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1020 n.3 (2d Cir. 1980) *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Local 3 completely ignores this post-*Teamsters* statement.

The Court, taking into account such considerations as the economic burden to the defendant and the number of class members as to whom a backpay award is now relevant, exercises its discretion in favor of awarding backpay to nonapplicant victims in this case. Suffice it to say that the

---

**2.** It is a frequent occurrence, especially in class action litigation, that settling defendants pay less in damages than those who pursue to the bitter end cases such as this one, in which liability is clearly established. The very concept of compromise and settlement embodies

the notion of a reduction from the amount plaintiffs otherwise hope to recover. The relationship between the award recommended by the Magistrate and the amount of the settlement in this case is not surprising.

Court adheres to its previously stated view that "limiting the type of relief available to a victim of discrimination because he is a nonapplicant would be inconsistent with the duty of the courts to 'secure justice' and provide a 'make whole' remedy for such victims." *Ingram*, 482 F.Supp. 918, 925 (S.D.N.Y.1979), *quoting Teamsters, supra,* 431 U.S. at 364, 97 S.Ct. at 1869.

The defendant contends that there was no clear proof of the futility of applying for a laborer's job such as to justify an award of backpay to nonapplicants. It further asserts that no class member proved a credible and convincing unexpressed desire to work as a laborer.

The Court sees no reason to change its prior post-trial finding that the atmosphere at the Garden was such that class members could reasonably have believed in the futility of seeking referral from Local 3. *See Ingram*, 482 F.Supp. 918, 923 (S.D.N.Y. 1979); *Ingram*, 482 F.Supp. 414, 421 (S.D.N.Y.1979). It should be noted that this finding was specifically endorsed by Magistrate Sinclair who stated that "defendants offered no proof displacing the inescapable finding which underlies Judge Sand's decisions and which I find to be sustained in all the testimony before me, that the futility of taking steps to seek a laborer's position was real, apparent and well known to the claimants." Magistrate's Findings of Fact at 3–4 (November 21, 1980).

The Court likewise rejects Local 3's second argument which is based solely on its general assertion that the claimants' testimony was incredible. Magistrate Sinclair's painstaking analysis of the evidence applicable to each individual claimant was exemplary. It is apparent from the Magistrate's findings and the record that he used an exacting standard before finding that a particular nonapplicant had a desire to be a laborer which remained unexpressed because of futility. The care with which the Magistrate considered all matters before him, including issues of individual credibility, is supported by the fact that he ultimately recommended a backpay award for only nineteen members of the plaintiff classes. The Court finds that there is ample evidence to support the conclusion that all but one of these class members did indeed hold a desire to become a laborer which remained unexpressed because of the futility of seeking a Local 3 referral.

The defendant argues that since the laborer's job is more strenuous than the cleaner's job, backpay awards should not be based on a laborer's salary. In support of this argument, the union points to sex discrimination cases which have attempted to harmonize Title VII with the Equal Pay Act, 29 U.S.C. § 206(d), a statute specifically designed to guarantee equal pay for equal work regardless of sex. *See* Defendant's Objections at 47–52. The defendant contends that since Equal Pay Act concepts have found their way into the equal pay sex discrimination cases brought under Title VII, such concepts should be incorporated into other types of Title VII actions. The Court rejects this argument. Defendant acknowledges that the cases on which it relies have been concerned specifically with the policy that Title VII doctrine not conflict with Equal Pay Act doctrine, thereby preventing a unified body of law from emerging in sex discrimination cases alleging unequal pay for equal work. This rationale is inapplicable to the present case, since neither the Equal Pay Act in particular, nor sex discrimination in general, is implicated. Local 3 has failed to provide the Court with any convincing reason for transplanting concepts which developed in the context of a particular type of employment discrimination and a particular sex discrimination statute to a case involving discriminatory referral practices based on race or national origin.

Local 3 states that early in 1977, the union had done all it legally could do to abate damages, and that it should therefore not be required to make any backpay award for post-1976 earnings. Even accepting *arguendo* defendant's representation as to its abatement of damages, this argument is insufficient in the context of this case. The plaintiffs seek backpay awards to compensate them for the injury they suffered as a

result of the defendant's discriminatory referral practices, and the defendant is liable for the effects of such practices through the time that the discrimination is actually remedied. In this case, the date of remedy would occur when the class member under consideration becomes a laborer. Local 3's abatement of damages is relevant only to the extent that there was an actual reduction in plaintiffs' compensable injuries. Local 3 has not contended that any action resulted in such a reduction.

■ The union asserts that all of the cleaners failed to mitigate damages by seeking a laborer's position inside or outside the Garden. Since feelings of futility justified the victims' failure to apply for Garden laborer jobs, it is obviously absurd for the defendant to argue, as it does, that these claimants should nevertheless be required to make this futile application for mitigation purposes.

As to the duty of plaintiffs to seek laborer's jobs outside the Garden, this Court fully endorses Magistrate Sinclair's reasoning. *See* Magistrate's Findings, Conclusions and Recommendations on Back Pay at 11–12 (July 27, 1981). The defendant has itself acknowledged that "[a]ll the court decisions ... held that persons holding full time jobs were not required to do anything more to mitigate damages." Magistrate's Findings, Conclusions, and Recommendations on Back Pay at 11 (July 27, 1981), *quoting* Memorandum in Support of Defendant's Contention that the Porters Had a Duty to Mitigate Damages at 1. And, as the Magistrate has explained:

> "The course urged by defendants would permit effective subversion of statutory purposes: employers could deny an individual a higher paying job and offer that individual the Hobson's choice of retaining his present job and forswearing back pay relief or leaving his present job for a job which, although perhaps nominally better paying, might require the sacrifice of convenience, security or seniority."

Magistrate's Findings, Conclusions and Recommendations on Back Pay at 12 (July 27, 1981). In any event, case law in this Circuit has held that "[t]o sustain its burden of establishing such deductions [from a back pay award], the defendant must show not only that the plaintiff failed to exercise due diligence in seeking employment, but also that had she been diligent, she might have found employment and had some earnings." *EEOC v. Kallir, Phillips, Ross, Inc.,* 420 F.Supp. 919, 926 (S.D.N.Y.1976), *aff'd* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Local 3 has failed to meet this burden.

Defendant further argues that many claimants worked less than they should have, reflecting a lack of reasonable diligence. Local 3 has wholly failed to prove this assertion, and apparently has foregone its opportunity during the development of the record to inquire into such matters as voluntary absences from work. Thus, the Court finds no merit in any of the defendant's objections relating to a failure to mitigate damages.

■ According to the defendant, the disciplinary records of some of the claimants would have prevented them from being hired as laborers even absent any discriminatory practices. This Court agrees with Magistrate Sinclair's conclusion that such records are irrelevant since, during the time period in question, the Garden never reviewed the prior work records of any laborer referrals. *See* Hearings Before the Magistrate at 869 (April 16, 1980) (Testimony of Mr. Donopria). Such records would therefore not have been the basis for a decision not to hire particular claimants, all of whom were continued in their employment at the Garden subsequent to the alleged infractions.

In addition to its many other exceptions, the defendant objects to the recommended award for each and every plaintiff for whom the Magistrate proposed relief. For the most part, the defendant attempts to show that the Magistrate's findings as to the credibility of these plaintiffs should be reversed.

■ The Court will not engage in a protracted recounting of the case in favor

of an award for each of those plaintiffs for whom the Magistrate made a favorable recommendation. Instead, the Court notes its support for the careful and conscientious manner in which the Magistrate made individual findings based on the record before him, the memoranda submitted by the parties, and most importantly, his judicious evaluations of credibility. As the plaintiffs have correctly noted, the Magistrate generally resolved instances of ambiguity or doubt against the claimant and, with the one exception noted below, he only recommended awards when the record fully supported such recommendations. *See* Plaintiffs' Reply at 25–26 and citations therein. It should particularly be observed that the Magistrate was in no way reluctant to discredit the evidence presented by a claimant when the circumstances so warranted. *See* Magistrate's Findings of Fact, at ¶¶ 5, 18, 21, 24, 79, 81, 95, 107, 137, 139 (November 21, 1980). The Court therefore expresses its approval of the Magistrate's individual award recommendations and enters into a discussion only of the findings with respect to the claimant Herbert Bruton. The Magistrate reviewed Bruton's claim solely on the basis of his pretrial deposition. *See* Magistrate's Findings of Fact at ¶ 152 (November 21, 1980). The Magistrate's finding was not, therefore, based upon a finding of credibility affected by the demeanor of a live witness. The Magistrate found that Bruton is an actual victim because he "showed that he would have applied for a referral to the Garden for work as a laborer had it not been for Local 3's discriminatory practices by testifying that he wanted the job but didn't apply because Shelly Anderson and J. Perry had tried to get the job and had been unsuccessful." Magistrate's Findings of Fact at ¶ 154 (November 21, 1980). The Magistrate further found that "Bruton's desire date is 1946 because he testified that he wanted the laborer job when he started at the Garden." *Id.* at ¶ 155. On the basis of these conclusions, Bruton was assigned a seniority date of October 24, 1965.

The Court cannot agree with this assessment of the record, and determines that

Herbert Bruton is *not* an actual victim of the defendant's discriminatory policies. Despite Bruton's single statement that he wanted the laborer job when he started at the Garden, he never applied for a laborer's job or told anybody that he was interested in it, allegedly because of his conversation with Anderson. After questioning as to Bruton's interest in various positions at the Garden, Bruton virtually admitted that he was not a victim:

"Q: The fact is that for many years before you spoke with Anderson and in fact from the time you started working at the Garden, you really had no interest in becoming a laborer, isn't that true?

A: No, I didn't."

Deposition of Herbert Bruton at 20–21 (January 17, 1979).

The Court agrees with the Magistrate's finding that "[a] 'couple of years' before he retired (i.e., as of 1973), Bruton was no longer interested in getting the job because he was on his way out." Magistrate's Findings of Fact at ¶ 153 (November 21, 1980), *citing* Deposition of Herbert Bruton at 15–16 (January 17, 1979). But this alleged loss of interest occurred at virtually the same time that Bruton had the conversation with Anderson which provided the basis for the Magistrate's finding that Bruton was a victim. Thus, even assuming *arguendo* that Bruton did at some point desire employment as a laborer, he renounced such interest at the very time that he would have become justified in failing to apply for the position because of futility.

The Court therefore is not persuaded that Bruton would have applied for a referral for work as a laborer had it not been for Local 3's discriminatory practices, and is further not satisfied that Bruton ever harbored a desire for that work. The Court finds that Bruton is not a victim and that he is therefore not entitled to any award.

We turn now to a discussion of some of the plaintiffs' objections to Magistrate Sinclair's reports and recommendations.

■ This Court has previously ordered Local 3 to submit a plan for the establishment of referral lists and copies of proposed notices to be posted in the Garden, as well as to set forth procedures for the referral of class members by Local 3. *See Ingram* 482 F.Supp. 918, 927–28 (S.D.N.Y.1979). It is undisputed that, since that time, Local 3 has ceased to play any role in the hiring of laborers at the Garden. Consequently, the Court agrees with the Magistrate's conclusion that these elements of prospective relief should be deemed mooted. *See* Magistrate's Interim Order on Monetary Relief at 18 (December 8, 1980). The plaintiffs' request that an Order issue limiting any future role of Local 3 in laborer hiring and referral is therefore rejected.[3]

Plaintiffs except to the Magistrate's determination that claimants Mahadeo, an Indian, and Ibrahim, an Egyptian, are not class members. The Court completely endorses the Magistrate's conclusion and reasoning on this issue as they are persuasively and comprehensively set forth in Magistrate's Findings of Fact at 4–10 (November 21, 1980).

■ On July 27, 1981, Magistrate Sinclair withdrew his earlier findings that Group V claimants—those who applied for or desired a laborer's position during 1978–1980—were victims of the defendant's discriminatory practices. *See* Magistrate's Findings, Conclusions and Recommendations on Back Pay at 4–9 (July 27, 1981). The Magistrate reasoned that the actual referral of laborers that was done during this period was not necessarily the result of the discriminatory policy found at trial.

The plaintiffs object to this reasoning with respect to two of the claimants, Luis Jaiman and Eloise Moore, and the Court finds these objections to be valid ones. These two claimants were assigned recommended seniority dates of October 11, 1978, based on the hire date of Group IV laborer Benigno Rivera. *See* Magistrate's Findings

of Fact at ¶¶ 73, 93 (November 21, 1980). The evidence presented at the trial, on August 27–30, contained up-to-date information as to statistics and referral policy, and Rivera's hire was included in the data upon which the finding of liability was largely premised. *See Ingram*, 482 F.Supp. 414, 424 and n.24 (S.D.N.Y.1979). The Court found that the defendant's discriminatory policy was in effect and continuously adhered to up through the time of the trial—a date subsequent to the time of Rivera's hire and Jaiman's and Moore's desire dates. *See id.* at 423.

The fact that Rivera is Hispanic means neither that Jaiman and Moore were not really victims, nor that the union had ended its discriminatory policies. Rather, as this Court found at trial, the defendant, *as part of its discriminatory policy*, occasionally hired blacks or Hispanics, albeit in numbers significantly below their percentage in the labor market surrounding the Garden. The Magistrate has stated that, in any event, the 1978 referral "would have been the rightful place of one of the four victims who sought or desired the laborer's position in late 1976, and not the rightful place of a claimant who desired a laborer's job in 1978." Magistrate's Findings, Conclusions and Recommendations on Back Pay at 7 n.2 (July 27, 1981). *See* also Magistrate's Interim Order on Monetary Relief, at 13 n.12 (December 8, 1980). However, if Jaiman and Moore are added to the list of Group IV victims, the total of such claimants is raised to six, a number exactly equal to the number of Group IV comparison laborer referrals made during the period 1976–1978. The Court is not persuaded that Jaiman and Moore could not, as a matter of rightful place relief, have filled the position for which Rivera was referred.

The plaintiffs concede that the recovery for these two claimants may appropriately be set at zero, for they state: "In view of the fact that no Group IV claimant's recom-

---

**3.** This Court will, in any event, be retaining jurisdiction over this proceeding (*e.g.*, with respect to front pay damages). Our ruling is without prejudice to a renewed application to

this Court in the event that Local 3 should resume exercising a role in the hiring of Garden laborers.

mended awarded [sic] included any backpay, no new computation need be done if Moore and Jaiman are included in the victim group." Plaintiffs' Objections Pursuant to 28 U.S.C. § 636(b) and Southern District of New York Rules for Proceedings Before the Magistrates, Rule 7 at 15 (hereinafter "Plaintiffs' Objections").

For the reasons stated above, the Court finds that Jaiman and Moore were actual victims of defendant's discriminatory policies, that their seniority date is October 11, 1978, and that they are entitled to no backpay.

Plaintiffs also object to the Magistrate's recommendation regarding the computation of claimants' lost annuity benefits. Plaintiffs seek annuity payments for certain claimants in amounts equal to the average annuity entitlement of the corresponding laborers' control group—a proposal which would make the union liable for amounts the Garden should have paid prior to the statute of limitations dates and seniority dates. They argue that annuity entitlement should be calculated according to when cash sums under the plan are payable to annuitants, rather than when the contributions are made to the fund. Plaintiffs' Objections at 20–24.

The Magistrate has discussed this issue thoroughly and persuasively, *see* Magistrate's Findings, Conclusions and Recommendations on Back Pay at 19–22 (July 27, 1981), and the Court completely adopts the reasoning which led him to conclude that "[t]he weight of logic and authority clearly favors defendant's position." *Id.* at 21.

The measuring period for plaintiffs' recovery in this case runs until the date when a particular victim is hired as a laborer. Many of the claimants who have been adjudicated victims of discrimination in this action have not yet attained their rightful place as laborers at the Garden. Since

these plaintiffs' future lost earnings are speculative and their lost pension benefits are ascertainable only at retirement, the Court will assume continuing jurisdiction over this case in order to evaluate these damages. Such "front pay," as recommended by Magistrate Sinclair, will be computed according to the same method that has been applied in calculating backpay. *See* Magistrate's Interim Order on Monetary Relief at 17 (December 8, 1980).

The Magistrate recommended a total backpay award of $749,317. Subtracting Herbert Bruton's suggested recovery from this amount, this Court finds that the victim claimants were monetarily damaged to the extent of $727,912. These class members have already been compensated $64,827 by virtue of the Consent Decree entered into between the plaintiffs and the defendants other than the union, and Local 3 will not be held accountable for that sum. The union has not argued that it is unable to pay the remaining amount of monetary damages, nor has it presented any persuasive reasons for which it should not be liable for that total.[4] The Court finds, therefore, that Local 3 is liable to the plaintiffs for a backpay award of $663,085.

## COUNSEL FEES

By order dated November 10, 1981, Magistrate Sinclair recommended that counsel for plaintiffs be awarded $233,445.06, of which $175,665.21 consists of fees based on a lodestar figure (reasonable hours expended multiplied by the reasonable hourly rate)[5]; $14,690.80 reimbursement for expenses; $27,973.04 as a multiplier augmentation, and $15,116.01 representing interest at 6%.

In calculating this award, the Magistrate recommended that the fee be based on one-third of the time spent prior to August 11,

---

**4.** *See* p. 1090, *supra.* This question was specifically reserved by the Court in its remedy Opinion. *See Ingram*, 482 F.Supp. 918, 927 (S.D.N.Y.1979).

**5.** This is computed at $100 per hour for Mr. Tesser and $60 per hour for his assistant, Ms.

Altman, except that time spent in preparing exhibits is to be compensated at the rate of $50 per hour. *See* Magistrate's Report Containing Findings and Recommendations Re Plaintiffs' Fee Application at 10, 18 (October 23, 1981) (hereinafter "Fee Report").

1979 (when settlement was reached with the co-defendants) and all of the attorneys' time spent between August 11, 1979 and December 13, 1979, augmented by a multiplier of 25%. On this latter date, liability of the defendant was fixed and therefore, the Magistrate reasoned, the time subsequently expended was not subject to the risks and contingencies for which a multiplier compensates. Plaintiffs' counsel makes no objection to the fee award.

We believe that the Magistrate's recommendation reflects a sound and thorough consideration of the issues presented and we have little to add to his perceptive analysis. For the reasons he has stated, neither the not-for-profit character of the defendant, nor an ability to pay factor, warrants an adjustment of the fee award on the basis of the record here. *See* Magistrate's Fee Report at 21 (October 23, 1981).

We find fully justified the Magistrate's observation that "instead of raising these issues at the hearing, defendant spent its time in a vexatious, time-wasting attack on plaintiffs' counsel and in an unfruitful, nit-picking excursion through innocuous details and markings in plaintiffs' counsel's time logs and records." Magistrate's Fee Report at 21–22 (October 23, 1981).

Defendant's objections to the fee recommended by the Magistrate are equally meritless.

Except as modified herein, the Magistrate's reports are adopted.

SO ORDERED.