Shelly ANDERSON, Wilfred Boudreaux, James Britt, John Carroll, Russell Footman, Waverly Green, Graydon Griffith, Lawrence Hawkins, Francisco Hernandez, Herbert Holmes, Henry Ingram, Clarence Lamar, William Moody, James Parrott, James Perry, James Pettigrew, George Sharpe, Sr., Kenneth Williams, Madison Square Garden Center, Inc. and Madison Square Garden Corporation, Plaintiffs,

v.

LOCAL UNION NO. 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Defendant.

No. 83 CIV 9301 (LBS).

United States District Court,
S.D. New York.

March 12, 1984.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs Madison Square Garden Center, Inc. and Madison Square Garden Corp.; Gerald D. Stern, Jamie B.W. Stecher, New York City, of counsel.

Lewis F. Tesser, New York City, for individual plaintiffs.

Norman Rothfeld, New York City, for defendant.

## OPINION

SAND, J.

This proceeding is the latest round in the protracted litigation arising from *Ingram v. Madison Square Garden, Center, Inc.,* 76 Civ. 5870 and *Anderson v. Madison Square Garden, Center, Inc.,* 78 Civ. 1453. In this action, plaintiffs seek a declaratory judgment[1] that they are not liable to defendant Local Union No. 3, International Brotherhood of Electrical Workers ("Local 3") for contribution, indemnification or otherwise in connection with a judgment entered against Local 3 in the above named actions. Contending that there is no factual question to be tried, plaintiffs have moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated herein, plaintiffs' motion is granted.

## FACTS

A full account of the facts giving rise to this action may be found in several of this Court's prior Opinions. *Ingram v. Madison Square Garden Center, Inc.,* 482 F.Supp. 414, 482 F.Supp. 918 (S.D.N.Y. 1979), 535 F.Supp. 1082 (S.D.N.Y.1982), *aff'd as modified,* 709 F.2d 807 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983). *See also Ingram v. Madison Square Garden Center, Inc.,* 482 F.Supp. 426 (S.D.N.Y.1979), (collectively "the antecedent litigation").

Stated briefly, the antecedent litigation involved suit by the class of all black and hispanic persons who were or would in the future be employed as cleaners at Madison Square Garden ("the antecedent plaintiffs"). Named as defendants were Madison Square Garden Center, Inc. and Madison Square Garden Corporation (hereinafter jointly referred to as "the Garden"), plaintiffs in this action,[2] Local 3, the defendant herein, and other entities. The antecedent plaintiffs alleged that the defendants had engaged in a pattern of hiring and employment practices which made it impossible for members of the plaintiff class to secure higher paying and more desirable positions as laborers at Madison Square Garden, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1985.

Prior to trial, all of the defendants in the antecedent cases except Local 3 entered into a consent decree, which was approved by the Court. *Ingram v. Madison Square Garden Center, Inc.,* 482 F.Supp. 426 (S.D.N.Y.1979). Pursuant to the consent decree, the settling defendants agreed to a wide spectrum of remedial measures, including immediate hiring of class members,

---

1. This proceeding was brought on by a new action for a declaratory judgment rather than a motion by the union in the main actions to obtain a more expeditious resolution of the controversy. See Transcript proceedings, December 15, 1983.

2. The individual plaintiffs in this action were members of the plaintiff classes in the antecedent litigation.

employment goals for minorities, mechanisms for minorities to obtain positions as laborers, monetary awards, and attorneys' fees. In return, the antecedent plaintiffs withdrew their claims against the settling defendants with prejudice and agreed to indemnify them from any claims by Local 3 seeking contribution or indemnification.

Subsequently, a trial was held against Local 3, with respect to the union's alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and § 1981 of the Civil Rights Act of 1871, 42 U.S.C. § 1981. The record disclosed that the union participated in the Garden's hiring decisions in the following way. When a vacancy occurred in the Garden's permanent laborer work force, the Garden would notify Local 3. The union would then select and refer an applicant to the Garden superintendent. Although the Garden was free to reject applicants referred to it by the union, it would not hire anyone who had not been given a "union slip." 482 F.Supp. at 420.

This Court found that Local 3 engaged in a referral policy that was "subjective and standardless," under which the primary qualification appeared to be personal acquaintance with a union official. *Id.* Moreover, when minorities sought information from Local 3 as to how to become a laborer, they were ignored, given evasive answers, or simply a general "run-around." *Id.* at 421. These and other practices, we held, established that the union had directly and purposely participated in violations of the antecedent plaintiffs' civil rights. *Id.* at 420–21, 535 F.Supp. at 1087. Accordingly, this Court entered judgment against Local 3 for injunctive and monetary relief. In doing so, we specifically accounted for the payments received by the plaintiffs from the settling defendants, and reduced Local 3's liability accordingly. 535 F.Supp. at 1095. On appeal, the Second Circuit modified the injunctive relief awarded against Local 3, and reduced or eliminated various items of monetary damages. *In-*

*gram v. Madison Square Garden Center, Inc.,* 709 F.2d 807 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983).

The plaintiffs herein, certain plaintiffs and settling defendants in the antecedent cases, then brought this action, seeking a declaratory judgment that they are not liable to Local 3 for contribution or indemnification in connection with the judgment entered against Local 3. In its answer in this action, defendant has asserted that it is entitled to such relief.

*Discussion*

■ At the outset, we believe it appropriate to address the question of what law governs determination of this case. Plaintiff, while not specifically advocating that state law is applicable, has nonetheless cited New York authorities in its brief. We agree with defendant that New York law does not control this case, although it may, of course, have persuasive effect. The question of whether contribution and indemnity are available under the federal civil rights laws should be governed by federal law. It would be anomalous if the availability of these remedies, as among defendants, varied according to the happenstance of the forum state in which the plaintiff brought the underlying action.

We begin with the undoubted proposition that Local 3 is estopped to deny its own intentionally wrongful conduct by virtue of the prior judgment of this Court. The question of the Garden's liability has never been adjudicated.[3] The defendant contends that it acted as the plaintiff's agent with respect to the hiring practices in which it participated and that, under principles of agency law, the Garden is thereby "primarily responsible" for the union's discriminatory conduct. We shall first address the merits of the contention that an agency relationship existed between the plaintiff and defendant.

■ The employment referral practices between the Garden and Local 3, without

---

3. The Garden did not concede liability in the Consent Decree but instead maintained "[it is]

and always [has] been in full and complete compliance" with the civil rights laws.

more, do not establish an agency relationship between these two entities. This point is conclusively established by *General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In that case, the Supreme Court held that an employee's § 1981 claim against his employer could not be predicated exclusively upon the discriminatory acts of his union. There, as here, the union exercised effective control over who was eligible for certain positions by operation of a "hiring hall" referral system. Nevertheless, the Supreme Court held that no agency relationship existed between the employers and the union. The core of the agency relationship, the Court noted, is a "'fiduciary relation' arising from the 'consent by one person to another that the other shall act on his behalf and subject to his control'". *Id.* at 393, 102 S.Ct. at 3151, *quoting Restatement (Second) of Agency* § 1 (1958). These elements were not supplied by the mere power of employers to oppose union discrimination. Moreover, the Court observed, as a general proposition, the contention that a union could act as an agent of the employers of its members "is alien to the fundamental assumptions upon which the federal labor laws are structured." *Id.* at 393, 102 S.Ct. at 3151.

Seeking to avoid the force of these observations, Local 3 in this action has alleged first, that it was an "employment agency" of the Garden under 42 U.S.C. § 2000e(c) and, second, that the Garden actively "authorized, directed, and ratified" the discriminatory actions of Local 3. (Defendant's "3(g) Statement" ¶¶ 3, 4, 7, 8, and 23). We find these legal[4] and factual[5] contentions highly dubious, but even if we are to accept

them, they would only constitute a basis for establishing the Garden's liability to the plaintiffs in the antecedent litigation. Whether there is any entitlement of Local 3 to contribution or indemnification from its former co-defendants is a separate question, and one to which we now turn.

*Contribution*

■ Under the doctrine of contribution, a tortfeasor seeks to distribute some but not all of the judgment rendered against him to one or more joint tortfeasors. By doing so, the plaintiff in a contribution action can avoid paying more than his proportionate share of the damages. *See, e.g., Tokio Marine & Fire Ins. Co. Ltd. v. McDonnell Douglas Corp.*, 465 F.Supp. 790, 794 (S.D.N.Y.1978). *See generally* Prosser, *Law of Torts* § 50 (1971).

■ The Supreme Court has recently held unanimously that contribution is not available to a defendant found in violation of the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964. *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). In that case, an airline found liable for violation of the civil rights of its employees brought an action for contribution against the plaintiffs' unions alleging common liability for the plaintiff's damages. The Court noted that the employer's right of contribution could only arise, if at all, under one of two theories: 1. as an implied right of action under the statutes, or 2. under federal common law. *Id.* at 90, 101 S.Ct. at 1580.

As to the first theory, the Court could find no indication of congressional intent to create an implied right of contribution in the statutory language or structure of the

---

4. The definition of "employment agency" in 42 U.S.C. § 2000e(c) applies only to claims under Title VII of the Civil Rights Act of 1964. As will be discussed more fully, *infra*, there is no right to contribution or indemnification under Title VII, *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Thus, Local 3's claims against the Garden can only arise, if at all, under § 1981, a statute to which the term "employment agency" does not apply.

5. We do not address these issues in a vacuum, but rather with an extensive record developed over years of discovery, hearings and trial. Although Local 3 is technically correct in contending that the questions now raised were not specifically at issue in the antecedent litigation, we have some difficulty with the view that we must accept as true factual contentions unsupported by any affidavit, document or reference to the record already developed in these actions.

act, the legislative history, or in any other source. *Id.* at 91–95, 101 S.Ct. at 1580–1582. While noting that none of these factors alone was necessarily dispositive, the absence of some manifestation of congressional intent conclusively undermined "the essential predicate for implication of a private remedy." *Id.* at 94, 101 S.Ct. at 1582.

The Court also refused to recognize a federal common law right of contribution under these statutes. Observing that no "general federal right to contribution ... has been recognized in [the] decisions of this Court," *id.* at 96–97, 101 S.Ct. at 1583–1584, Justice Stevens warned that the federal judiciary should not, and indeed, could not, create common law rights that Congress had deliberately chosen to omit from statutory schemes. Moreover, "[t]he presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement," as was the case with the Equal Pay Act and Title VII. *Id.* at 97, 101 S.Ct. at 1583. Judicial meddling with such statutes "might upset carefully considered legislative programs." *Id.*

Defendant has sought to distinguish *Northwest Airlines* in two ways. First, defendant contends that the unions in that case, unlike the plaintiffs here, were not named as respondents in the underlying action. Seizing upon the Court's qualification that its holding did not address "[a] court's broad power under [Title VII] to fashion relief against all respondents named in a properly filed charge," *id.* at 93, n. 28, 101 S.Ct. at 1581, n. 28, Local 3 maintains that the holding therefore does not bar actions for contribution among named respondents. This contention may be quickly rejected. The qualification in footnote 28 of *Northwest Airlines* addresses only a court's power to apportion damages among Title VII defendants in a judgment. Whether such defendants have a right later to bring contribution actions against one another is an entirely different question. We do not believe that the Court intended in these few lines to carve out a broad exception to the rule it otherwise developed with such care. Nor do we see any rationale supporting this proposed exception.

Local 3's second attempt to distinguish *Northwest Airlines* has somewhat more substance, but fails nonetheless. It contends that § 1981 lacks the comprehensive legislative scheme and administrative enforcement provisions of Title VII, and that, therefore, the Supreme Court's admonitions against the federal judiciary creating common law remedies that Congress deliberately chose to admit have less force in this case. Thus, the argument runs, a Court's common law powers under § 1981 are broader than under Title VII. We find merit in plaintiff's contention that different results on the question of contribution are unlikely to follow under Title VII and § 1981 because the substantive requirements of these statutes are analogous. *See, e.g., Chance v. Bd. of Examiners and Bd. of Education*, 534 F.2d 993, 998 (2d Cir.1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977). However, we have serious doubts that it is necessary for us to reach this question, because even if contribution can be countenanced under § 1981, Local 3 should not be able to avail itself of this right. In this case, the defendant has been found liable under both Title VII and § 1981, and we believe that *Northwest Airlines* should bar all of its contribution claims. The comprehensive legislative scheme for Title VII enforcement would also be disrupted by contribution actions among joint Title VII and § 1981 defendants. Moreover, we do not see why defendants found liable under both Title VII and § 1981 should have a right to contribution that is denied to defendants violating Title VII alone.

■ Even assuming, however, that the federal judiciary has the power to recognize a right of contribution under § 1981 (and that Local 3 could avail itself of this right), it remains to decide whether to do so would be desirable or consistent with common law principles. A finding of intent to

discriminate is a prerequisite to liability under § 1981. *General Building Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). It has long been the rule at common law, still followed in the vast majority of jurisdictions,[6] that contribution will not lie in favor of an intentional tort feasor. See generally, Prosser, *The Law of Torts* § 50 at 305–06, 308 (1971); *Restatement (Second) of Torts* § 886A(3) and comment j. The basis for this rule is that "the courts will not aid one who has deliberately done harm, so that no man can be permitted to found a cause of action on his own intentional tort." *Id.* We see no reason to depart from the common law rule.

Finally, even if recognition of a right to contribution were otherwise proper, we would still have to consider the effect of the release given to the Garden by the plaintiffs in the antecedent litigation. As plaintiff points out, under New York law, this release, if given in good faith,[7] would bar any claims for contribution that Local 3 might otherwise have. N.Y.Gen.Oblig.Law § 15–108(b) (McKinney 1974). However, as previously discussed, New York law does not control this question, and the New York rule is only one of three approaches that courts have taken in addressing this issue. See *Restatement (Second) of Torts* § 886A comment m.

Under the first approach, a release given to one tortfeasor has no effect upon the right of joint tortfeasors who have paid more than their equitable share of plaintiffs' damages to seek contribution from the settling defendant. Under the second view, a release given in good faith extinguishes all claims for contribution by other tortfeasors. The third approach also disallows contribution but "diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor." *Id.*

Noting that "[i]mportant policy reasons ... weigh against each of the three solutions," the Restatement takes no position as to which one is the preferred approach. Because we believe that Local 3 would have no right of contribution in any event, we have no occasion to sort out the relative advantages and disadvantages of these three rules. We only note in passing that under two of the three approaches (together in this respect constituting the majority view), any right to contribution that Local 3 might otherwise have would be defeated by the release given the Garden by the antecedent plaintiffs.[8]

*Indemnity*

Unlike contribution, which distributes liability for the plaintiff's damages among two or more tortfeasors, indemnity "shifts the entire loss from one tortfeasor who has been compelled to pay it to the shoulders of another who should bear it instead". Prosser, *The Law of Torts* § 51 at 310 (1971). A right of indemnity may

---

**6.** Limited exceptions have been created by statute, *see* Prosser, *The Law of Torts* § 50 at 308, n. 69, or when "one ... is charged with a purely technical tort without any real intent to do harm, as in the case of one who has intentionally entered the land of another ... in the innocent belief that the land is his own." *Restatement (Second) of Torts* § 886A, comment j.

**7.** Defendant has alleged that the settlement between the antecedent plaintiffs and the Garden was not in good faith. *See* Rothfeld Affidavit at ¶ 5A–C. We note first of all that Local 3 had the opportunity to raise these arguments in the antecedent litigation in opposition to the proposed consent decree. Moreover, in approving the consent decree, this Court noted that the proposed settlement gave the plaintiff classes "benefits ... at least commensurate with any they could reasonably have expected from a full trial." 482 F.Supp. at 429.

**8.** Local 3 might contend that, even if the third approach were adopted, its right of contribution should not be extinguished because we did not previously reduce its liability to the antecedent plaintiffs "by the amount of the equitable share of the obligation" of the Garden. As previously noted, we diminished Local 3's liability only by the amount the Garden actually paid in settlement. 535 F.Supp. at 1095. Even assuming, however, that the "equitable share" of the Garden were greater than this amount, the time for Local 3 to raise this contention was in the previous litigation. Re-examination of this question now would be barred by principles of *res judicata.*

either arise "by contract or by operation of law to prevent a result which is regarded as unjust or unsatisfactory." *Id.* Obviously, only the second basis could apply in this case.

 Although the Supreme Court in *Northwest Airlines* addressed itself only to claims for contribution, we assume that the rationale of that case would equally bar claims for indemnity. As with contribution, such claims could only arise by implication under the statutes or under common law principles, and the same arguments would preclude recognition of indemnity under either theory. Thus, to the extent that *Northwest Airlines* bars recognition of a right to contribution in this case, it does so as well for indemnity.

Additionally, no right of indemnity could be recognized here under universally recognized principles of common law. Local 3's claim in this regard seems to be premised on the contention that, in violating the antecedent plaintiff's civil rights, it was acting as the agent of the Garden, which was thus "primarily responsible" for the union's actions. While indemnity is sometimes allowed where "[t]he indemnitee acted pursuant to directions of the indemnitor," the indemnitee must "reasonably [have] believed the directions to be lawful". *Restatement (Second) of Torts* § 886B(2)(6). Local 3 is estopped by the prior findings of this Court to assert that it had a good faith belief in the lawfulness of its conduct.

Indemnity, like contribution, cannot be allowed in favor of an intentional tortfeasor. Indeed, the rationale for this rule is even stronger in the case of indemnity, because an intentional tortfeasor receiving indemnification would escape liability completely for his own deliberate wrongdoing. That he may have been "following orders" should not absolve him of the intended consequences of his actions.

In summary, we believe that, even accepting the factual allegations in Local 3's "3(g) Statement" as true, summary judgment should be granted as a matter of law.

Thus, we find no merit in defendant's suggestion that it should be granted an evidentiary hearing. Accordingly, for the reasons stated, plaintiff's motion is granted.

SO ORDERED.